OPINION
{¶ 1} Blanche Cotton-Taris, appellant, appeals from a judgment of the Franklin County Probate Court, in which the court granted the motion filed by Edward L. Taris, executor of the estate of Joseph E. Taris ("Taris"), appellee, to establish the validity of an antenuptial agreement executed by appellant and Taris and to set aside appellant's spousal election to take against the will.
 {¶ 2} On January 14, 2000, Taris and appellant executed an antenuptial agreement. In executing the agreement, appellant was represented by counsel, who drafted the agreement, and Taris was not. On January 21, 2000, Taris and appellant married. On March 10, 2003, Taris died testate and was survived by appellant and his four children. Taris's will was submitted to probate on May 8, 2003, and his son was appointed as executor for Taris's estate.
 {¶ 3} On August 27, 2003, appellant filed an election of surviving spouse to take against the will, and, on October 8, 2003, she filed exceptions to the inventory. On November 17, 2003, the executor filed a motion to quash appellant's request for spousal allowance and a motion to establish the validity of antenuptial agreement and set aside appellant's spousal election. On January 14, 2004, a hearing was conducted before a magistrate on the executor's motion to establish the validity of the antenuptial agreement. On February 23, 2004, the magistrate issued a decision, in which he found that the antenuptial agreement was valid and the agreement contained "strong and unmistakable language," pursuant toTroha v. Sneller (1959), 169 Ohio St. 397, to deprive appellant of her statutory spousal rights. Therefore, the magistrate set aside appellant's election to take against the will, and the exceptions to the inventory were dismissed.
 {¶ 4} Appellant filed objections to the magistrate's decision on March 8, 2004. On April 8, 2004, the court issued an entry, in which it overruled appellant's objections and adopted the magistrate's decision, finding there existed strong and unmistakable language in the agreement to set aside appellant's statutory spousal rights. The court filed another entry journalizing the April 8, 2004 entry on November 15, 2004. Appellant appeals the judgment of the trial court, asserting the following assignments of error:
I. The trial court erred in preventing the surviving spouse from electing to take against the will and to receive a family allowance, which conflicted with both the express terms of the antenuptial agreement and the weight of authority.
II. The trial court erred by looking at the "big picture" and factors outside of the four corners of the antenuptial agreement in order to attempt to ascertain the intent of the parties.
III. The trial court erred by finding that strong and unmistakable language is contained in the antenuptial agreement depriving appellant of her spousal rights, when no such language exists in the antenuptial agreement.
IV. The trial court committed reversible error when it held that the antenuptial agreement prevents the surviving spouse from exercising her spousal rights.
 {¶ 5} We first note that appellant lists the above four assignments of error but fails to present a separate argument containing her contentions with respect to each assignment of error, in contravention of App.R. 16(A)(7). This court may disregard an assignment of error presented for review if the party raising it fails to argue the assignment separately in the brief. See App.R. 12(A)(2). Further, appellant includes additional contentions in the argument section of her brief that do not clearly correspond to the contentions in any of the listed assignments of error. Pursuant to App.R. 12(A)(1)(b), this court is required to determine the appeal based upon the assignments of error set forth in the briefs under App.R. 16. This is procedurally necessary, as we are permitted to sustain or overrule only assignments of error and not mere arguments.
 {¶ 6} Nevertheless, despite these briefing inadequacies, this court will address the merits of the case. However, consistent with the mandates of App.R. 12(A)(1)(b), we will determine the merits of appellant's appeal based upon the assignments of error as listed. In doing so, we will attempt to match the contentions contained in the argument section of the brief with the listed assignments of error. Further, we will not address any additional contentions in the argument section of the brief that do not plainly fall under one of the listed assignments of error.
 {¶ 7} Appellant's first and fourth assignments of error are basically the same and merely present general arguments that are dependent upon the more specific arguments in the other assignments of error. Appellant argues in her first assignment of error that the trial court erred in preventing her from electing to take against the will and to receive a family allowance, which conflicted with both the express terms of the antenuptial agreement and the weight of authority. Appellant argues in her fourth assignment of error that the trial court committed reversible error when it held that the antenuptial agreement prevents the surviving spouse from exercising her spousal rights. As these assignments of error cannot be resolved until the other assignments of error are addressed, we must first address appellant's second and third assignments of error.
 {¶ 8} We will address appellant's second and third assignments of error together, as they involve overlapping issues. Appellant argues in her second assignment of error that the trial court erred by looking at the "big picture" and factors outside of the four corners of the antenuptial agreement in attempting to ascertain the intent of the parties. Appellant argues in her third assignment of error that the trial court erred by finding that "strong and unmistakable" language is contained in the antenuptial agreement depriving appellant of her spousal rights, when no such language exists in the agreement.
 {¶ 9} An antenuptial agreement is a contract entered into in contemplation of a couple's future marriage whereby the property rights and economic interests of the parties are determined and set forth.Rowland v. Rowland (1991), 74 Ohio App.3d 415, 419. In Ohio, "public policy allows the enforcement of prenuptial agreements." Fletcher v.Fletcher (1994), 68 Ohio St.3d 464, 466. Further, under Ohio law, parties to a prenuptial agreement are permitted to cut one another off entirely from any participation in the other's estate. Hook v. Hook (1982),69 Ohio St.2d 234, 235; Daniels v. Daniels, Franklin App. No. 01AP-1146, 2002-Ohio-2767. Thus, it is well-settled law in Ohio that antenuptial agreements are enforceable so long as certain conditions are met. SeeFletcher, at 466; Kelm v. Kelm (1993), 68 Ohio St.3d 26, 28. In the present case, we need not address whether such conditions were met because both parties agree that the antenuptial agreement is valid and binding on them. Rather, this court must construe and apply the terms of that agreement to the present facts and circumstances.
 {¶ 10} The Ohio Supreme Court has found that antenuptial agreements are contracts and that the law of contracts will generally apply to their application and interpretation. See Fletcher, at 467. This is a matter of law to be determined by the courts. See Latina v. Woodpath DevelopmentCo. (1991), 57 Ohio St.3d 212, 214. The trial court's resolution of a legal issue is reviewed de novo on appeal, without any deference afforded to the result that was reached below. See Graham v. Drydock Coal Co.
(1996), 76 Ohio St.3d 311, 313.
 {¶ 11} A court should interpret a contract to carry out the intent of the parties as manifested by the language of the contract. Skivolocki v.East Ohio Gas Co. (1974), 38 Ohio St.2d 244, paragraph one of the syllabus. When the terms of the contract are clear and unambiguous, courts may not create a new contract by finding intent not expressed by the terms. Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241,245-246. In analyzing an unambiguous contract, words must be given their plain and ordinary meaning. Forstner v. Forstner (1990),68 Ohio App.3d 367, 372. With these principles in mind, we turn to the construction and application of the antenuptial agreement at issue in the present case.
 {¶ 12} Appellant contends in this assignment of error that the trial court erred in finding that the antenuptial agreement contained "strong and unmistakable" language, pursuant to Troha, supra, to deprive her of her statutory spousal rights. In Troha, the Ohio Supreme Court found that "strong and unmistakable language in a prenuptial agreement is necessary to deprive a surviving spouse, and particularly a widow, of the special benefits conferred by statute." Id. at 402. The "strong and unmistakable" language that the court primarily relied upon in Troha was "the said second party * * * covenants and agrees to relinquish * * * any and all rights or claims in or to the estate of the said first party which may arise or accrue by virtue of said marriage." Id. at 399-400. The court found that this phrase was all inclusive and was intended to release every right accruing to or conferred upon the surviving wife by law in and to the property of her deceased husband upon his death after the marriage was consummated. Id. at 402. The court concluded that the agreement was designed and intended to deprive the surviving spouse of the special benefits conferred by statute, and that it was the plain intention of the parties to accomplish that object. Id.
 {¶ 13} In the present case, both parties agree that the sole issue is whether Taris's will contained the requisite "strong and unmistakable" language pursuant to Troha. In finding that the language contained in the agreement was strong and unmistakable, the magistrate found:
A thorough review of the entire agreement reveals that the parties to this Antenuptial Agreement clearly intended to address all of their respective marital obligations to each other during their lifetimes and to pass their individual assets to their respective heirs at their deaths. They each intended to give up their spousal right to receive property from the deceased spouse's estate. Any other interpretation of this document is in opposition to what the parties intended and what the whole of the Agreement reveals. Sections (1), (3) (A), (3) (C), (8), (11), and (15) * * * all support this conclusion.
 {¶ 14} The trial court agreed that there existed strong and unmistakable language in the antenuptial agreement, citing portions of Sections (1), (3)(A), and (3)(C).
 {¶ 15} Section (1) of the agreement, entitled "Background," provides, in pertinent part:
* * * Each owns individually various assets and property, real and personal, tangible and intangible, and the parties intend that each shall retain any such property free and clear of any claim by the other, as though each were remaining single, subject only to the provisions set forth herein.
 {¶ 16} Subsections (A) and (C) of Section (3) of the agreement, entitled "Recitals," provide:
(A) The parties anticipate that each will retain sole and exclusive control, enjoyment, and use of all property (of any nature whatsoever) which they each brought to the marriage, as identified in Exhibits A and B. They further anticipate that they will share the benefits that flow from their respective investments in any manner they may agree, so long as they remain married to each other and continue to reside together. Should either party decide not to remain in the marriage, the individual parties would have sole and exclusive control and possession of all individual assets brought individually to the marriage. They further anticipate that they both will be free to dispose of their own property in any manner they so choose, either during their lifetime by way of sale or gift, or upon death.
* * *
(C) The parties agree that Ms. Cotton will assert no claim of interest of any kind or type in the real property belonging to Mr. Taris, and more fully described in Exhibit A, attached hereto and incorporated herein. Ms. Cotton will execute a Quit Claim Deed and Release of Dower immediately after entering into the state of matrimony with Mr. Taris. In the event of Mr. Taris's death, Ms. Cotton would vacate the premises of the property described in Exhibit A within twelve (12) months of Mr. Taris's demise. During that twelve month period, Ms. Cotton would pay any utilities, taxes, or other expenses arising from her occupancy of the premises. This twelve month provision shall apply not only to Mr. Taris's presently owned real estate property, but to any real estate property he may acquire individually in the future. However, should the parties jointly purchase and own real estate in the future, this provision would not apply to such jointly owned real estate. In the event that the parties jointly purchase and own real estate in the future, the party surviving the other will have full possession, use, and enjoyment of such real estate for a) so long as he or she may live, or b) so long as he or she may desire to continue residing therein. For such jointly held real estate, the parties may bequeath their respective interest as they so desire.
 {¶ 17} Section (8) of the agreement, entitled "Additional instruments," provides:
Mr. Taris and Ms. Cotton shall, from time to time, upon the other's request, execute, acknowledge, and deliver any and all instruments of release or conveyance which may be necessary or desirable to enable the other to dispose of any and all property belonging to such other, whether now owned or subsequently acquired, free and clear of any right of dower or other spousal rights, and such further instruments as may reasonably be requested by the other. Upon the death of either party, the survivor shall furnish to decedent's personal representative, and to his/her heirs or assigns, such instruments as may be requested in order to evidence and carry into effect the releases and waivers provided for herein.
 {¶ 18} Section (11) of the agreement, entitled "Partial invalidity; survival," provides:
This Agreement is effective during the lifetime of each of the parties and shall survive the death of each. In the event that any portion hereof is found to be contrary to law by a court of competent jurisdiction, then the other provisions hereof shall nevertheless remain in full force and effect and, as to the portions deemed contrary to law, such language and provisions shall be substituted therefor as shall effectuate the parties' intentions as expressed herein.
 {¶ 19} Section (15) of the agreement, entitled "Binding effect," provides:
This Agreement shall inure to the benefit of, and shall be binding upon, the heirs, executors, administrators and successors of the parties.
 {¶ 20} Appellant claims that the agreement, including the above-quoted portions, does not contain the same or similar "all inclusive" language found to be strong and unmistakable in Troha. As explained above, the "strong and unmistakable" language that the court primarily relied upon in Troha was "the said second party * * * covenants and agrees to relinquish * * * any and all rights or claims in or to the estate of the said first party which may arise or accrue by virtue of said marriage." Id. at 399-400. Although there is no language in the present agreement that is identical to the language in Troha, we believe it is sufficiently "all inclusive" so as to be strong and unmistakable.
 {¶ 21} As for Section (1), quoted above, the initial language "the parties intend that each shall retain any such property free and clear of any claim by the other, as though each were remaining single" is all inclusive. Although it does not delineate specific time periods or property, it is its generality that makes it all encompassing to include the parties' desire to retain separately all property, free and clear of any claims by the other, either in their lives or upon their deaths. However, the closing phrase "subject only to the provisions set forth herein" removes the all-encompassing tone of the previous section and essentially renders the degree of inclusiveness contingent upon the rest of agreement. Therefore, the actual comprehensiveness of Section (1) cannot be determined until the remainder of the provisions are examined.
 {¶ 22} Section (3) provides the strongest all-inclusive passages. Subsection (A) provides that "[t]he parties anticipate that each will retain sole and exclusive control, enjoyment, and use of all property (of any nature whatsoever) which they each brought to the marriage." Subsection (A) also provides that the parties also anticipate "that they both will be free to dispose of their own property in any manner they so choose, either during their lifetime by way of sale or gift, or upon death." These two passages clearly grant unlimited control over the parties' individual property to each party under any and all circumstances. Further, despite appellant's claim that Section (1) and (3) merely provide for what shall occur during the lives of the parties, the exclusivity of control accorded to the parties in Sections (1) and (3)(A) is implicitly of unlimited temporal duration and that accorded in Section (3)(A) explicitly extends to "upon death." Therefore, we find Section (3) includes all-inclusive language that is strong and unmistakable pursuant to Troha.
 {¶ 23} With regard to Section (8), the pertinent parts of that section state that the parties must execute any instruments of release or conveyance to allow the other party to dispose of any individual property "free and clear of any right of dower or other spousal rights," and also that "[u]pon the death of either party, the survivor shall furnish to decedent's personal representative * * * such instruments as may be requested in order to evidence and carry into effect the releases and waivers provided for herein." Reading these two parts together, it is evident that the agreement permitted the parties to dispose of any property free and clear of any spousal rights of the other at any time, including upon their deaths. We believe this section also contains strong and unmistakable language evincing that the agreement was designed and intended to deprive the surviving spouse of the special benefits conferred by statute.
 {¶ 24} Appellant claims the language in Section (8) of the agreement is a boilerplate provision and not intended to be the substance of the agreement. However, appellant fails to explain why this section should be considered "boilerplate," outside of asserting that it is standard language in these types of documents. Merely because certain provisions are typically included in contracts of a certain nature alone does not render such provisions insignificant boilerplate. Appellant cites no authority that this particular provision should be considered mere boilerplate, apart from pointing out that it is identical to a form provided in a popular legal treatise. However, a review of the record reveals that appellant has attempted to introduce evidence of this treatise for the first time on appeal by attaching it to her appellate brief. This court cannot consider exhibits or other matters attached for the first time to an appellate brief that were not properly certified as part of the trial court's original record. See Isbell v. Kaiser Found.Health Plan (1993), 85 Ohio App.3d 313, 318; In re Strong, Franklin App. No. 01AP-1418, 2002-Ohio-2247. Nevertheless, that the drafter of the document tracked a sample form from a treatise to draft the provision does not necessarily render it a boilerplate provision of little substantive import. With no evidence to the contrary, we can only find that this provision was deliberately included in the agreement, and the parties meant what they said therein.
 {¶ 25} As for Sections (11) and (15), they are general provisions that indicate the agreement remains effective after the deaths of the parties and is binding upon the parties' heirs and executors. Although the language in these provisions is conclusive as to how the deaths of the parties affect the agreement, we do not believe they provide strong and unmistakable language to support or refute whether the agreement was designed to preclude appellant from exercising her statutory spousal rights upon the death of Taris.
 {¶ 26} Accordingly, after reviewing the above sections, we believe Sections (3) and (8) provide the requisite strong and unmistakable language necessary to deprive appellant of the special benefits conferred by statute, pursuant to Troha.
 {¶ 27} However, appellant contends that the second sentence in Section (4) of the agreement demonstrates that she did not relinquish her right to exercise her statutory spousal right to election upon the death of Taris. Appellant asserts that the other language in the agreement cannot be "strong and unmistakable" because of this second sentence of Section (4). Section (4), entitled "Division of estates of the parties," provides:
The parties may each make such wills and bequests as they each determine. Neither party shall surrender any rights as they might exist at the time of the death of the other party.
 {¶ 28} In addressing Section (4), the magistrate found:
* * * It is only the second sentence in Section (4), which appears to permit Mrs. Cotton-Taris to retain her spousal rights in her husband's estate. But [t]his sentence is in direct opposition to the sentence that precedes it as well as the rest of the Agreement. * * *
* * *
The first sentence of Section (4) of the agreement is consistent with all the remaining Sections of the agreement. It is only the second sentence that makes this Section of the agreement ambiguous.
It was Mrs. Cotton-Taris who had the advice of her own counsel before she executed this document. She chose Beverly Farlow to advise her with regards to this document. No evidence was presented that would lead to a finding that she did not understand what she was giving up by signing this agreement. In fact her counsel acknowledged that she had advised Mrs. Cotton-Taris concerning the contents of the Antenuptial Agreement. The language contained therein is "strong and unmistakable" as required by the Supreme Court in Troha. Therefore this document must be construed in the favor of Mr. Taris and his estate given these facts and circumstances. Therefore the only possible conclusion upon review of this matter is that Blanche Cotton-Taris gave up her spousal rights in the Antenuptial Agreement * * *.
 {¶ 29} In adopting the decision of the magistrate, the trial court held, with respect to Section (4):
* * * This is the phrase creating the issue in this case. It is not clear from the language in Section (4) itself as to the intent of the parties to the Agreement, therefore the Court must look at the document as a whole to make that determination. Ms. Cotton interprets Section (4) to mean that she is entitled to exercise her right to take the spousal election. However, the executor of the estate of Mr. Taris, while admitting that the wording of Section (4) is confusing, interprets the intent of Section (4) to be that each party to the Agreement may execute a will and leave his/her property to whoever they wish, including the surviving spouse, if they so choose. The intent of the parties is best interpreted by looking at the "big picture," i.e., look at the circumstances surrounding the execution of the document and all the language of the document. M. Cotton looks only at two (2) sentences in the document and makes a literal interpretation of those sentences. Looking at the entire document, her interpretation of those sentences are in conflict with the big picture language which shows both parties to the Agreement intended to dispose of their property independent of the other.
 {¶ 30} Appellant contends that the second sentence in Section (4) references spousal rights and that such language was included to make clear that the parties were not giving up their spousal rights upon the death of the other party. Appellee counters that a plain reading of Section (4) establishes that the parties were reserving their right to make wills or bequests to the other spouse and leave property to whomever they chose upon death. Appellee points out that there is no specific reference to dower rights or spousal rights, as in other sections of the agreement.
 {¶ 31} Contract terms are ambiguous where the language is susceptible to two or more reasonable interpretations. United States Fid. Guar.Co. v. St. Elizabeth Med. Ctr. (1998), 129 Ohio App.3d 45. In the present case, we find the interpretations offered by both appellant and appellee to be reasonable. Therefore, we agree with both the trial court and the magistrate that the second sentence in Section (4) is ambiguous.
 {¶ 32} Where there is an ambiguity, courts must resort to principles of contract construction. Shifrin v. Forest City Ent., Inc. (1992),64 Ohio St.3d 635, 638. "All the provisions of a contract must be construed together in determining the meaning and intention of any particular clause or provision therein." Legler v. United States Fid. Guar. Co. (1913), 88 Ohio St. 336. Thus, courts will seek to harmonize the meaning of an ambiguous provision with the meaning of the agreement as a whole. Barton v. Aydin (Nov. 25, 1981), Cuyahoga App. No. 43453. The intention of the parties to the agreement is paramount, and contracts should be interpreted to carry out that intent insofar as it can be ascertained. Skivolocki, at 244.
 {¶ 33} When examining contract language that is ambiguous, a court must first examine parol evidence to determine the parties' intent. Clinev. Rose (1994), 96 Ohio App.3d 611, 615. Such extrinsic evidence may include: (1) the circumstances surrounding the parties at the time the contract was made; (2) the objectives the parties intended to accomplish by entering into the contract; and (3) any acts by the parties that demonstrate the construction they gave to their agreement. Blosser v.Carter (1990), 67 Ohio App.3d 215, 219. However, when parol evidence cannot elucidate the parties' intent, a court must apply the secondary rule of contract construction whereby the ambiguous language is strictly construed against the drafter. Reida v. Thermal Seal, Inc., Franklin App. No. 02AP-308, 2002-Ohio-6968.
 {¶ 34} In the present case, the trial court cited extrinsic evidence in arriving at its decision. The trial court indicated that it considered the "surrounding circumstances" of the parties, although it did not specify these circumstances in its conclusions. However, some such surrounding circumstances as cited in the court's factual summary that are supportive of the parties' intent to prohibit either of them from participating in the other's estate upon death were that the parties had both been previously married, they were of advanced age, they had adult children from their previous marriages, and Taris executed a will and living trust that made no provisions for appellant. It has been recognized that parties to antenuptial agreements often have previously been married, are of advanced age, and have children from the prior marriage and, because so, desire to distribute their individual property to those other than the most recent spouse. See Gross v. Gross (1984),11 Ohio St.3d 99, 102-103; see, also, Hawkins v. Hawkins (1962), 185 N.E.2d 89, 89 Ohio Law Abs. 161 (the desire to leave one's assets to those other than the most recent spouse is not at all unusual, particularly when the parties are of advanced age and neither had contributed to the accumulation of the assets prior to the marriage); Inre Mosier's Estate (1954), 133 N.E.2d 202, 72 Ohio Law Abs. 268 (in upholding validity of antenuptial agreement the court considered that the contracting parties were persons of advanced age with children by former marriages). We agree with the trial court that these surrounding circumstances support the conclusion that Taris and appellant desired to wholly exclude the other from participation in their respective estates upon death.
 {¶ 35} Even if this parol evidence did not reveal the parties' intent, we would apply the secondary rule of contract construction that requires strict construction against the drafter. The magistrate noted that appellant's counsel drafted the agreement, Taris was not represented by counsel, appellant had advice from her counsel before executing the agreement, there was no evidence presented that would suggest she did not understand what she was giving up by signing the agreement, and appellant's counsel acknowledged that she had advised appellant concerning the contents of the agreement. Under these circumstances, there is no reason to depart from the rule that the drafter of a contract should have the terms thereof construed strictly against her. Accordingly, as appellant was the drafter of the ambiguous provision, it should be construed against her.
 {¶ 36} Consequently, under either rule of construction, we must construe the second sentence of Section (4) to mean that the parties were reserving their right to make wills or bequests to the other spouse and leave property to whomever they chose upon death. Such a construction is consistent with the other provisions of the agreement, particularly Section (3), and harmonizes Section (4) with the intent of the agreement as a whole, which we found above was to preclude the surviving spouse from participating in the estate of the other party, including participation through statutory election. See Legler, supra; Barton,
supra. To interpret Section (4) in the manner appellant urges would be to completely contradict the intent of the rest of the agreement.
 {¶ 37} However, even though we have construed Section (4) in such a way as to be consistent with the intent of the rest of the agreement to prohibit the parties from invoking their statutory rights upon the death of the other, the issue remains whether unambiguous provisions in an antenuptial agreement may still constitute strong and unmistakable language, pursuant to Troha, sufficient to demonstrate the intent of the parties to waive their statutory rights to election, despite the existence of a single provision within the agreement that has been found to be ambiguous. In accord with the decisions of the magistrate and trial court, we answer this question in the affirmative and find that, despite the existence of one ambiguous provision, the remaining unambiguous provisions may still provide the strong and unmistakable language necessary to deprive a surviving spouse of the special benefits conferred by statute, as long as the ambiguous provision has been construed to be consistent with the unambiguous provisions.
 {¶ 38} Our research reveals no authority on point. However, we see no reason why the ambiguous provision in Section (4), once construed pursuant to the rules of contract construction to be consistent with the remaining unambiguous provisions, should render otherwise strong and unmistakable language insufficient under Troha. Once the ambiguous provision has been adjudicated to be consistent with the purpose of the whole, it has no less legally persuasive value than the other unambiguous provisions. At that point, all of the provisions would be deemed to be consistent with the intent to deprive the surviving spouse of his or her statutory rights. Thus, as long as there exists strong and unmistakable language in other provisions, an ambiguous provision later adjudicated to be consistent with those provisions should not negate the strength and certainty of the other provisions.
 {¶ 39} Appellant points to The Matter of the Estate of: Mowery (Dec. 8, 1982), Summit App. No. 10813, for the proposition that, even if an ambiguous clause in an antenuptial agreement is construed to bar the right of statutory election, it cannot constitute strong and unmistakable language pursuant to Troha. However, Mowery is inapposite to the facts in the present case. In Mowery, the entire antenuptial agreement was silent regarding the right of either party to share in a distributive portion of the other's estate. To the contrary, in the present case, we have found that several unambiguous provisions in the antenuptial agreement provide strong and unmistakable language prohibiting the parties from invoking their statutory election right. Thus, unlike Mowery, we are not attempting to construe an entire ambiguous agreement to provide strong and unmistakable language. Further, it is debatable whether Mowery is even a case involving contractual ambiguity, as the agreement in that case contained no ambiguous provisions, but, rather, was totally lacking any provisions addressing the issue of spousal election. Considering such, Mowery appears to be a case involving the simple application of the included contractual terms.
 {¶ 40} For these reasons, we find the January 14, 2000 antenuptial agreement executed by appellant and Taris contained "strong and unmistakable" language consistent with Troha. Specifically, Sections (3) and (8), and consequently (1), were all inclusive and intended to release every right accruing to or conferred upon appellant by law in and to the property of Taris upon his death. Further, construing Section (4) as we have, it is consistent with the purpose of Sections (1), (3), and (8). Thus, we find the agreement as a whole was designed and intended to deprive the surviving spouse of the special benefits conferred by statute, and it was the plain intention of the parties to accomplish that object. Therefore, appellant's assignments of error are overruled.
 {¶ 41} Accordingly, appellant's four assignments of error are overruled, and the judgment of the Franklin County Probate Court is affirmed.
Judgment affirmed.
Lazarus and French, JJ., concur.