OPINION
{¶ 1} Defendant-appellant, Kenneth J. Steinke (hereinafter "Kenneth") appeals the judgment of the Auglaize County Court of Common Pleas, Domestic Relations Division.
 {¶ 2} Kenneth was married to the plaintiff-appellee, Carrie Steinke (hereinafter "Carrie"), in October 1997. Prior to the marriage, both parties signed an antenuptial agreement. The parties separated on or about November 1, 2001, but continued seeing each other until sometime in August 2002. On June 16, 2003, Carrie filed a complaint for divorce.
 {¶ 3} The trial court held a divorce hearing on March 30, 2004. During the hearing, Kenneth's attorney, Dennis Faller (hereinafter "Attorney Faller"), requested leave to withdraw as counsel. The trial court granted Attorney Faller's request and the hearing was continued. On June 28, 2004, the trial court held the final hearing on the divorce. In the judgment entry of divorce, the trial court ordered that $113,731.53 be paid to Carrie from the $149,728.16 currently held in an escrow account.
 {¶ 4} It is from this judgment Kenneth appeals and sets forth six assignments of error for our review. For clarity of analysis, we will address Kenneth's assignments of error out of the order presented by him and will combine assignments of error where appropriate.
 ASSIGNMENT OF ERROR NO. I The trial court erred as a matter of law by not interpretingthe antenuptual [sic.] agreement contract between these partiesto preclude any recovery whatsoever by appellee.
 ASSIGNMENT OF ERROR NO. VI The trial court erred as a matter of law by findingappellant's pension at Ford Motor Company to be marital propertyand awarding appellee $6,911.51.
 {¶ 5} In his first assignment of error, Kenneth argues the trial court erred in its interpretation of the antenuptial agreement. Specifically, Kenneth argues that language in the antenuptial agreement addressed the proceeds from the real estate acquired after the marriage, the tax refunds, and the Ford pension and provides that the foregoing are Kenneth's separate property. As a result, Kenneth argues the trial court should not have awarded $113,731.53 to Carrie.
 {¶ 6} Kenneth argues, in his sixth assignment of error, that the trial court erred in awarding Carrie the growth in his monthly pension benefits from the Ford pension because it is his separate property.
 {¶ 7} The Ohio Revised Code provides that "`marital property' does not include any separate property." R.C. 3105.171(A)(3)(b). Separate property includes "[a]ny real or personal property or interest in real or personal property that is excluded by a valid antenuptial agreement." R.C. 3105.171(A)(6)(a)(v). The Ohio Supreme Court has defined an antenuptial agreement as "a contract entered into between a man and a woman in contemplation, and in consideration, of their future marriage whereby the property rights and economic interests of either the prospective wife or husband, or both, are determined and set forth in such instrument." Gross v. Gross (1984), 11 Ohio St.3d 99, 102, 11 OBR 400, 464 N.E.2d 500.
 {¶ 8} In the present case, Kenneth and Carrie signed an antenuptial agreement prior to their marriage and neither party disputes the validity of the agreement. Instead, Kenneth argues the trial court erred in its interpretation of the antenuptial agreement.
 {¶ 9} The law of contracts generally applies to the interpretation of an antenuptial agreement. Fletcher v.Fletcher, 68 Ohio St.3d 464, 467, 628 N.E.2d 1343,1994-Ohio-434, citing 2 Williston on Contracts (3 Ed. 1959), Section 270B. The interpretation of an antenuptial agreement is a matter of law and thus is reviewed under a de novo standard. Inre Estate of Taris, 10th Dist. No. 04AP-1264, 2005-Ohio-1516, at ¶ 10, citations omitted.
 {¶ 10} Although appreciation on separate property during the parties' marriage is generally marital property, a valid antenuptial agreement can exclude that appreciation. Millsteinv. Millstein, 8th Dist. Nos. 79617, 79754, 80184-80188, 80963, 2002-Ohio-4783, at ¶ 98, citing Radcliffe v. Radcliffe (Apr. 27, 1994), Montgomery App. No. 14130.
 {¶ 11} Paragraph ten of the antenuptial agreement provides that "[i]n the event of a legal separation of the parties, or in the event that the marriage of the parties is dissolved by means of a Decree of Judgment Entry * * * then each party shall retain sole ownership of his or her own property, whether said property is in the same form or is in another form due to conversion, trade, sale, and reinvestment, or has increased in value,irrespective of the cause of the increase, such as from improvements, infusion of funds, or inflation * * *." Emphasis added.
 {¶ 12} The antenuptial agreement listed the value of Kenneth's Ford pension as "approximately $1,600/month"; however, at the time of the divorce hearing the Ford pension value had increased to $2,294.17/month. In its judgment entry, the trial court found that the increase in pension benefits was due to Kenneth's continued employment at Ford during the parties' marriage and that Carrie should be awarded a portion of the pension increase. We believe the trial court was in error in so holding.
 {¶ 13} The Ford pension and its approximate value was listed as one of Kenneth's assets in the antenuptial agreement. The inclusion of the Ford Pension in the antenuptial agreement was not limited to the approximate value listed in the agreement. Although the Ford pension increased in value due to Kenneth's continued employment, the antenuptial agreement provides that increases in listed assets, regardless of the reason for the assets increase, remain that party's separate property. Consequently, we hold that, pursuant to the language of the antenuptial agreement, the increase in the Ford pension is Kenneth's separate property, and the trial court erred in awarding Carrie a portion of the increase in its value.
 {¶ 14} Kenneth also argues that the antenuptial agreement covered the joint tax refunds from 1997-2001 and that the refunds constituted Kenneth's separate property. Further, Kenneth maintains that the mere fact that the parties filed joint tax returns does not take the tax refunds out of the antenuptial agreement. As a basis for his arguments, Kenneth points to the case of Millstein v. Millstein, 8th Dist. Nos. 79617, 79754, 80184-8, 80963, 2002-Ohio-4783.
 {¶ 15} In Millstein, the parties had a prenuptial agreement which provided that property acquired by each party from their separate funds should be their separate property. Id. at ¶ 106. The Eighth District found that even though the parties had filed a joint tax return, one party had paid the taxes, including the overpayment, from their separate property; therefore, the refund belonged to that party. Id. The present case is distinguishable from Millstein. Here, both Kenneth and Carrie were employed and had funds withheld for taxes during the relevant years unlikeMillstein where the funds were solely from one of the parties' separate property.
 {¶ 16} Furthermore, Kenneth and Carrie's antenuptial agreement does not specifically state that any jointly filed tax return refunds are governed by the antenuptial agreement. While the antenuptial agreement generally provides that each party's separate property is to remain their separate property, the joint tax return refunds cannot be attributed solely to one party's separate property. Consequently, the joint tax return refunds are not covered by the antenuptial agreement and must be considered marital property.
 {¶ 17} The antenuptial agreement also included a listing of Kenneth's extensive real estate properties. However, the agreement did not list four properties all located in Wapakoneta, Ohio, which were acquired after the parties' marriage including: 14496 Cemetery Road, (hereinafter "Yellow House"); 14498 Cemetery Road (hereinafter "Log Cabin");[1] 112 North Wagner Street (hereinafter "Wagner Street House"); and 904 Middle Street (hereinafter "Middle Street House"). Kenneth maintains that the profits from the sale of the four properties during the marriage were covered by the antenuptial agreement, and thus the profits were Kenneth's separate property. Kenneth points out that all real property was titled only in his name and that he made all the decisions of when to buy and sell real estate. Kenneth further maintains that there was no need to discuss tracing or conversion of separate property because the antenuptial agreement addressed the real estate proceeds bought and sold during the marriage and maintained the property as his separate property.
 {¶ 18} The antenuptial agreement stated in part:
4. Unless as otherwise provided herein, all property, real orpersonal, tangible or intangible, which each of the parties ownedbefore the marriage of the parties, or which each may thereafteracquire (including, without limitations dividends, interest,rents, profits, or increments in value thereof) shall be andshall remain the personal estate of such party, free from anyclaim whatsoever on the part of the other by way of dower,statutes of descent and distribution, or applicable laws asthough no marriage had been entered into between the parties.
 5. In the event the proposed marriage of the parties isterminated by Divorce, Dissolution, or Legal Separation, then,neither party shall claim or receive spousal support from theother and any joint debt shall be allocated in the sameproportion between the parties as their interest in jointproperty is allocated. Further, any individual debt shall be thesole debt and responsibility of the party who incurred such debt.Each party shall receive his or her separate property, includingany appreciation in value and subject to any depreciation invalue, free of any claim of the other party, but subject to anydebt against said property.
* * *
10. In the event of a legal separation of the parties, or inthe event that the marriage of the parties is dissolved by meansof a Decree or Judgment Entry entered by a Court of competentjurisdiction, then, each party shall retain sole ownership of hisor her own property, whether said property is in the same form oris in another form due to conversion, trade, sale, andreinvestment, or has increased in value, irrespective of thecause of the increase, such as from improvements, infusion offunds, or inflation, and shall retain sole ownership of his orher property acquired by gift, bequest, or inheritance during themarriage, whether said property is in the same form or is inanother form due to conversion, trade, sale, and reinvestment, orhas increased in value, irrespective of the cause of theincrease, such as from improvements, infusion of funds, orinflation. Each of the parties waive and release the other fromany claim for spousal support, maintenance, or alimony after thetermination of marriage, whether such rights arise by statute orcommon law and irrespective of fault by the other party.
 {¶ 19} Pursuant to the antenuptial agreement, separate property acquired after the marriage by each party separately was that parties' separate property. The antenuptial agreement further provides that upon divorce or dissolution each party shall keep their separate property even if the property is in another form due to reinvestment. Thus, we must determine whether the properties are covered under the language of the antenuptial agreement because they were either acquired separately by Kenneth or they consisted of the reinvestment of separate property.
 {¶ 20} In its judgment entry, the trial court found that it was impossible to trace the funds for the real estate purchases. The trial court found that the funds used to purchase the Log Cabin and the Yellow House were borrowed from the bank and that the loan payments were made from Kenneth's checking account. According to the trial court, the loan payments on the properties were made with undocumented funds from Kenneth's mother, undocumented payments from the sale of other real estate, or were partially paid by joint tax refunds which had been deposited in Kenneth's Fifth Third checking account.
 {¶ 21} At the divorce hearing, Kenneth testified that he purchased the Yellow House and Log Cabin by using a mortgage for the entire amount of the property. Kenneth further testified that he took out a $100,000 mortgage on the log cabin using the yellow house as collateral and used the mortgage to purchase the Wagner Street House. There was no testimony as to how the funds to purchase the Middle Street House were obtained.
 {¶ 22} Kenneth testified regarding the payments on the mortgage. According to Kenneth's testimony, he had funds from all sources deposited into his one Fifth Third checking account including the joint tax return refunds, rent money, the proceeds from premarital real estate, and his wages from his employment. Kenneth testified that he used the Fifth Third Checking account to make payments on the mortgage. Kenneth testified that the mortgage was paid by using funds from various premarital homes, a loan from his mother, and rent money earned from his premarital property.
 {¶ 23} Although Kenneth testified that the mortgage was paid with the sale of premarital homes, a loan from his mother, and rent money earned from his premarital property, Carrie testified that some of the parties joint tax refund money was used to pay on the mortgage. Moreover, the trial court found that Kenneth's testimony regarding lump sum payments on the mortgage from premarital property was not credible given that the bank records in evidence did not line up with the sale of premarital homes.
 {¶ 24} Based on the available record, we find it is impossible to trace the exact source of the funds used to repay the loan on the Yellow House and Log Cabin, and to purchase the Middle Street House and Wagner Street House. Kenneth paid the loan using his Fifth Third checking account which included deposits from premarital real estate, rent income, a loan from his mother, refunds from jointly filed tax returns in which Carrie had also contributed to the tax payments, and wages Kenneth earned from his employment. However, the exact sources and amount of funds in the Fifth Third checking account was not established by substantial, probative evidence. The fact that Kenneth was the only one listed on the title to the properties and that he made the decisions regarding when to buy and sell real estate does not necessarily establish that the properties were his separate property especially given the fact that the checking account used to make loan payments included untraceable separate and marital funds that were co-mingled. Since the evidence in this case does not enable the properties acquired during the marriage to be traced to Kenneth's separate property, the properties and the proceeds from their sale were not covered by the parties' antenuptial agreement. Thus, the property and the proceeds from the sale of that property must be considered martial property, and the trial court did not err in so holding.
 {¶ 25} In summary, we hold the antenuptial agreement covers the increase in Kenneth's Ford pension, therefore, Carrie should not have been awarded a portion of the increase. The jointly filed income tax returns were joint property and therefore marital property not covered by the antenuptial agreement. The proceeds from the sale of the four real estate properties acquired after the marriage were not covered under the antenuptial agreement and thus marital property.
 ASSIGNMENT OF ERROR NO. II The trial court erred as a matter of law in awarding appellee$64,192.00 of joint tax refunds for tax years 1997, 1998, 1999,2000, and 2001 because although the tax refunds were martialproperty they were not currently owned by the parties at the timeof the divorce as required by R.C. 3105.171(A)(3)(a)(i).
 ASSIGNMENT OF ERROR NO. III The trial court erred as a matter of law in awarding appellee$42,628.02 of profit from the sale of real estate bought and soldduring the marriage because although the real estate profits weremarital property they were not currently owned by the parties atthe time of the divorce as required by R.C.3105.171(A)(3)(a)(i).
 ASSIGNMENT OF ERROR NO. IV Assuming the rest of its analysis is correct, the trial courterred as a matter of law by not reducing the income tax award toappellee by $6,147.50, one-half of the $12,295.00 of taxesappellant owed in 2002?
 ASSIGNMENT OF ERROR NO. V. The trial court erred as a matter of law by calculating themiddle street sale profit to be $11,599.00?
 {¶ 26} Kenneth argues, in his second and third assignments of error, that the definition of marital property includes property which is "currently owned" and the tax return refunds for 1997-2001 and the real estate profits from the Yellow House and Middle Street House were not "currently owned". Although Kenneth acknowledges that Attorney Faller had $149,728.16 in an escrow account on June 28, 2004, which included the gross proceeds from the sale of the Log Cabin and the Wagner Street House, he argues the profits from the Yellow House and Middle Street House were not escrowed and thus were not "currently owned".
 {¶ 27} Kenneth further maintains the trial court erred when it determined the tax refund as a marital asset without considering the taxes he owed to the federal, state, and local governments on his separate 2002 tax return in the amount of $12,295.00. Further, Kenneth maintains that the tax refund awarded to Carrie should be reduced by $6,147.50 or one-half the tax owed by him in 2002.
 {¶ 28} In his fifth assignment of error, Kenneth asserts the trial court made a mathematical error when calculating the profits from the sale of the Middle Street House.
 {¶ 29} The trial court must divide marital property equally. R.C. 3105.171(C)(1). However, if the equal division of marital property would be inequitable then the trial court must divide marital property equitably. Id. The trial court has broad discretion in dividing property in a divorce. Berish v. Berish
(1982), 69 Ohio St.2d 318, 319, 23 O.O. 3d 296, 432 N.E. 2d 183. An appellate court reviews the trial court's judgment in a divorce action under an abuse of discretion standard. Holcomb v.Holcomb (1989), 44 Ohio St.3d 128, 131, 541 N.E.2d 597. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, 5 OBR 481,450 N.E.2d 1140.
 {¶ 30} We do not read the trial court's judgment entry as dividing and ordering payment of the actual tax refunds or real estate proceeds. Rather, we consider it the trial court's method of reasoning and explaining why an unequal division of existing assets was appropriate and how it reached the amounts it did. Clearly, the court was allocating to the parties funds that then presently existed and which were held in the described escrow account. Although the language of the judgment entry could have been more precise, we do not find error in the court's reasoning or division of property. Kenneth's second, third, fourth, and fifth assignments of error are, therefore, overruled.
 {¶ 31} Having found error prejudicial to appellant herein, in the particulars assigned and argued, we reverse the judgment of the trial court as it relates to the Ford pension and remand for further proceedings consistent with this opinion. In all other respects, the judgment of the trial court is hereby affirmed.
 Judgment affirmed in part, reversed in part, and cause remanded. BRYANT, P.J., concurs as to reversal of judgment pursuant toAssignment of Error Six but dissents without written opinion asto disposition of remaining assignments of error.
 {¶ 32} Rogers, J. Concurs in part, dissents in part. I concur with the majority on assignments of error one two, three, four and five. However, I respectfully disagree with the majority's result reached in the sixth assignment of error.
 {¶ 33} On the sixth assignment I agree with the conclusion of the trial court that any increase in the defendant's pension at Ford Motor Company which resulted from his continued employment during the term of the marriage should be considered as marital property. I would agree that any appreciation of the pension proceeds which existed prior to marriage should be free from claims of the plaintiff. However, I see no language in the antenuptial agreement, prepared by defendant's counsel, that would preclude the pension proceeds earned during the term of the marriage from becoming marital property.
 {¶ 34} Accordingly I would affirm the judgment of the trial court in its entirety.
[1] The Yellow House and Log Cabin were purchased at an auction which took place prior to the parties marriage, however, the sale was not finalized until after the parties' marriage. Since the sale was not finalized until after the parties' marriage, the properties were acquired after the parties' marriage. The Yellow House and Log Cabin were a part of the same parcel of land, however, the properties were divided into two properties and were re-sold separately.