[Cite as *In re A.H.*, 2015-Ohio-4461.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | **No. 15AP-1** |
| [A.H., | : | (C.P.C. No. 02JU-7040) |
| John T. Ryerson, Jr., guardian ad litem for mother, M.S., | : | (ACCELERATED CALENDAR) |
| Appellant]. | : | |
| | : | |

## D E C I S I O N

### Rendered on October 27, 2015

*Heather R. Saling*, for appellee Franklin County Children Services.

*John T. Ryerson, Jr.*, guardian ad litem appellant.

**APPEAL from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch**

BRUNNER, J.

{¶ 1} Guardian ad litem, John T. Ryerson, Jr., appeals from a final judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, that granted permanent custody of his ward's minor child, A.H., to appellee, Franklin County Children Services ("FCCS"). We overrule Ryerson's assignment of error and affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2} A.H. was born on March 2, 2001. Her mother, M.S., is Ryerson's ward and suffers from considerable mental health problems including schizophrenia and bipolar mood disorders. M.S. has four children, including A.H., and has raised none of them. A.H.'s two younger brothers are in an adoptive home and her older sister is in a care

facility and is non-verbal.  The longest M.S. has lived with any of her children is ten months.

{¶ 3}  Based on information concerning M.S.' mental health-related behavior, in January 2002 FCCS filed a complaint seeking to find that A.H. was a dependent child. That case was dismissed and refiled on April 29, 2002  The trial court granted temporary custody to FCCS in the current case for the first time on April 30, 2002.  After a number of unsuccessful placements, and in light of the need for a permanent placement and the inability or unwillingness of A.H.'s family to care for her, on April 4, 2013, FCCS filed a motion for permanent custody.  A.H.'s father did not oppose the motion but her mother, M.S., and her mother's guardian ad litem did.  The common pleas court held a trial on the motion with witnesses on October 20, and 23, 2014.

{¶ 4}  In the time since temporary custody was first granted to FCCS in 2002, A.H. has been in at least 17 different placements.  She has lived with multiple foster families and been in a number of residential hospitals.  She was briefly reunited with M.S. in 2004 which, according to A.H.'s guardian ad litem, was disastrous for A.H. due to abuse.  In the last 10 years, M.S. has seen A.H. less than 10 times and written her approximately 10 to 15 letters to which A.H. has not responded.  A.H. was also briefly reunited with her father in 2012 but, due to challenges in raising A.H., her father voluntarily relinquished custody after less than six months.

{¶ 5}  The myriad of placements are explained in part by the fact that A.H., like M.S., exhibits problematic behavior that is related to her mental health. Testimony at trial varied about A.H.'s exact diagnosis, but witnesses testified that she suffers from attention deficit/hyperactivity disorder, post-traumatic stress disorder, reactive attachment disorder, oppositional defiant disorder, and bipolar mood disorder, and that she can become physically dangerous to herself and others.  One caseworker testified that A.H. hears her mother's voice in her head and is afraid her mother will find and hurt her.  On several occasions, A.H.'s mental health conditions have necessitated residential hospital stays, at least one of which extended to one and one-half years in duration.  The guardian ad litem for A.H., and all three caseworkers who testified, explained that A.H., because of her mental health issues, is a very challenging child to raise and that they would not, at this point, recommend placement with anyone who does not have therapeutic training for

dealing with her behavior.  For example, when A.H. was briefly reunited with her father in 2012, the absence of a caregiver with appropriate therapeutic training was said to have contributed to A.H.'s mental deterioration to the point that she began to pose a danger to herself and her father's other children to the point that her father felt compelled to relinquish custody.

{¶ 6}  A.H.'s mother, M.S., has also experienced periodic hospitalization because of her mental health conditions, most recently in 2012 and 2013.  In M.S.' most recent hospitalization, she had to be treated with Haldol and was preoccupied with the delusion that A.H. (then 12) was pregnant.  M.S. testified at trial that she now takes medication. However, all three FCCS caseworkers who testified at trial said that M.S. had not been compliant with the mental health requirements of the case plans set by FCCS.  One worker, for example, testified that M.S. repeatedly referred to her "right" to have her doses lowered.  (Oct. 20, 2014 Tr. 67.)

{¶ 7}  In addition, M.S. consistently demonstrated an inability to control herself during trial, interrupting witnesses with loud accusations and comments laced with profanity and, at one point, despite an order from the trial judge to turn off her phone, M.S. answered a telephone call during court in the middle of testimony and proceeded to have a conversation:

> JUDGE: Hold on one second. Let's get this phone turned off.
>
> [M.S.]: No, it's my uncle. What's going on - - they're up here lying on me right and left.

(Oct. 20, 2014 Tr. 74.); *see also* ("Yes I did, lying ass.") (Oct. 20, 2014 Tr. 93.); ("Oh my God. I don't know how much more I can take. I just don't - - I don't understand why people lie on me.  Jesus. I've never lied (inaudible).  This is bull shit.") (Oct. 20, 2014 Tr. 95-96.); ("He's lying.  I didn't even talk to him (inaudible).  He's a fucking liar.  I didn't even speak to him at all.") (Oct. 20, 2014 Tr. 97.); ("Have no bond absolutely whatsoever with my kid, right?  I'm outta (sic) here.  I'm -- I'm done.  I'm cool.  Do what you want. Lying ass motherfucker.  I ain't (sic) never had no bond with my baby.") (Oct. 20, 2014 Tr. 105.); ("This is bull shit. This bitch is a liar.") (Oct. 20, 2014 Tr. 164.)

{¶ 8}  Even when not speaking out of turn, M.S.' speech was not well-focused and at times non-responsive to questions asked.  She responded to a question on cross-

examination by demanding that the attorney representing A.H. be disqualified from the case because, according to M.S., the attorney had previously "said he didn't believe in God." (Oct. 20, 2014 Tr. 46.) M.S. was permitted the opportunity to speak following closing as to why she should have custody of A.H. She offered, in relevant part, the following:

> I come from a very well successful family and a religion as Mormon but I'm not Mormon anymore, but my daughter - - my family has - - has works with the government and works with [Mental Retardation and Developmental Disabilities] and can - - my uncle has clearly come out of nowhere and said "don't you understand that we work with them. We work for MRDD. Our family does. We can get someone to train you or whatever it takes to bring this - - to put a cycle to be broken of - - of - - of adoption because my sisters and brothers were adoption (sic). I was 12 years old and I had already been raped and I had to stand there and my grandfather had died at 14 of cancer of the liver, both military sides of the family. I had to watch everything go on as a child and the oldest one and they came to me and tried to adopt me and I said "whoa, whoa, whoa, whoa. I'm not going to be adopted." So my brothers and sisters were adopted and I never thought - - I just want to tell the Court and Children Services, can you imagine what pain I've been through?

(Oct. 23, 2014 Tr. 100-01.)

{¶ 9} In addition, M.S.' testimony reflected a failure to grasp the depth of her and A.H.'s mental health conditions. About herself, she testified: "I can handle myself very well without my medication." (Oct. 20, 2014 Tr. 26.) About A.H. she repeatedly insisted that A.H.'s problems stemmed not from her mental health conditions, but, rather, simply from teenage disobedience. She testified that she believed that A.H. had attention deficit/hyperactivity disorder, bipolar, schizophrenia, and "RADS," "[b]ut [A.H.'s] main problem is listening to authority. She cannot run game on me. She cannot tell me that she would like to have boys at her house - - at my house, that's now [sic] allowed. She is not allowed to date." (Oct. 20, 2014 Tr. 52.) "I have to be stern with [A.H.] because I did the same thing to my mother. I was in foster care and I was going through a lot more than [A.H.] has. I was raped at nine years old. * * * And they tried to adopt me out but my brothers and sisters were adopted out but I have never given up - - [A.H.] just does not

\* \* \* want to comply."  (Oct. 23, 2014 Tr. 83.)  M.S. also described a conversation with A.H., in one of the few visits between the two of them, as follows:

> I said, "[A.H], you have to comply with my rules. I'm moving to the suburbs and getting out of the hood. I'm moving back to where we were when I had you. I don't need a boyfriend. I don't want a boyfriend when you come home. I want you and your siblings to be able to come home if you want to. If you want to all - - if you want us all to be together then God will make that happen." I said, "but you are going to be on birth control. You're not going to be running being in boys' face. There are rules that you have to follow." And it's not surprising that I told her that because my mother had the same conversation with me before she died and the room shook, like the earth was shaking. "Sit down, the Lord has sent me - - sent me here - - back here to tell you that you are the only one going to be able to raise these children. No one else." And I was crying hysterically and I told the pastor to pray for my mother before she died, I said "let it be God's will."

(Oct. 23, 2014 Tr. 84-85.)

{¶ 10} The guardian ad litem for A.H., Ruthellen Weaver, summed up the problem with the prospect of M.S. having custody of A.H. or even frequent of interactions between M.S. and A.H. as follows:

> [A.H.] has very specific diagnoses and had demonstrated a pattern for most of her life of being - - of having a difficult time attaching to other human beings and it's a situation which has caused her to have a diagnosis that we call Reactive Attachment Disorder it's one of - - I've seen at least five diagnoses on her; makes it very difficult for anyone who has not had a lot of therapeutic training to parent her.
>
> \* \* \*
>
> [T]he mother loves her daughter very much but she has a number of her own burdens and sometimes if you take someone who has, by testimony, a diagnosis of schizo-effective [sic] bipolar and you combine it with a child who has issues including child bipolarity they can set each other off and make it much harder for either to achieve stability \* \* \*.

(Oct. 23, 2014 Tr. 65.)

{¶ 11} Although at the time of trial A.H. was once again in a residential treatment facility, she had, until recently, been doing well in a therapeutic foster home with G.J.

FCCS workers expressed the hope and intention that A.H. could return to G.J. when she improved enough to leave residential treatment. In addition, G.J.'s sister, P.J., had also expressed an interest in bolstering her therapeutic knowledge in order to adopt or at least aid in the care of A.H. in a therapeutic home environment. The current caseworker testified that A.H. does not want to see or visit her mother, M.S., and wants to live with G.J. and P.J. In addition, although the mental health needs of both M.S. and A.H. took center stage in the trial, caseworkers testified that neither M.S. nor father have completed the objectives set forth for them in the case plans.

{¶ 12} Although he was not permitted to ask questions during trial, M.S.' guardian ad litem was permitted to testify. Recognizing the mental challenges facing his ward, Ryerson testified that the trial court should consider a planned permanent living arrangement ("PPLA") as a less drastic alternative to permanent custody.

{¶ 13} After hearing the case at trial and interviewing A.H. in camera, the trial court issued a written decision on December 4, 2014, in which it awarded permanent custody to FCCS for purposes of adoption. On January 2, 2015, M.S.' guardian ad litem, Ryerson, appealed. On March 11, 2015, M.S. attempted to appeal; however, we dismissed that untimely appeal for want of jurisdiction. *In re: A.H.*, 10th Dist. No. 15AP-179 (June 15, 2015). Thus, this case proceeds solely on the appeal by M.S.' guardian ad litem, Ryerson.

## II. ASSIGNMENT OF ERROR

{¶ 14} Ryerson advances a single two-part assignment of error for our review:

> The trial court erred in granting permanent custody of A.H. to Franklin County Children Services.
>
> A. The trial court erred in failing to consider a disposition of a Planned Permanent Living Arrangement (PPLA), because A.H. met the criteria for such a disposition.
>
> B. Even if the trial court believed that it had no authority to make an order of PPLA, the court erred in granting permanent custody, because the evidence presented confirmed the serious psychological issues that A.H. suffered from, making her unadoptable, necessitating a continuation of temporary custody.

## III. DISCUSSION

{¶ 15} Having set forth his assignment of error as discussed above, Ryerson makes other arguments in his brief. He argues:

> I. The Court's Refusal To Allow the Guardian ad Litem for Mother To Participate in the Trial Did Not Allow Him to Present Evidence in Support of His Position That Alternatives to Permanent Custody Should be Considered By the Court.
>
> II. The Court Below Had the Authority to Make an Order to Grant a Planned Permanent Living Arrangement Or to Extend Temporary Custody.
>
> III. The Evidence Before the Court Established That A.H. Would Be Eligible for an Order for a Planned Permanent Living Arrangement.

(Ryerson's Brief, 17, 20, 27.) We are under no obligation to address assignments of error that are not argued nor arguments that do not apply to an assignment of error. *In re Estate of Taris*, 10th Dist. No. 04AP-1264, 2005-Ohio-1516, ¶ 5; App.R. 16(A)(7) and 12(A)(1)(b). However, recognizing that a permanent custody determination is an exceedingly serious matter, we nonetheless choose to address the points Ryerson's brief raises. *See, e.g., In re O.J.*, 10th Dist. No. 05AP-810, 2006-Ohio-286, ¶ 9, citing *In re Hayes*, 79 Ohio St.3d 46 (1997).

### A. Whether the Court Plainly Erred in Refusing to Allow Ryerson to Question Witnesses

{¶ 16} Although Ryerson's argument heading suggests that he was not allowed to participate in the trial, in fact he was permitted to testify as to the wishes and interest of his ward, M.S. The restriction the trial court imposed was based on a comment made sua sponte at the start of trial, "procedurally I do not allow Guardian ad Litem for an adult to ask questions." (Oct. 20, 2014 Tr. 5.) Ryerson did not attempt to question witnesses, did not request permission to question witnesses, and did not object to the prospectively stated limitation by the trial court. Accordingly, we may recognize the error alleged, only if it is plain. *State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, ¶ 13.

{¶ 17} We have previously addressed a very similar situation and concluded that it was not plain error to have denied to a guardian ad litem for a mother who was represented by separate counsel the right to question witnesses. *In re: K.J.D.*, 10th Dist.

No. 12AP-652, 2013-Ohio-610, ¶ 44-55. Ryerson suggests that *K.J.D.* is distinguishable because in this case he made his wishes known to the trial court and that he, rather than M.S., filed the appeal here. First, while it is true that in *K.J.D.* the mother, not the guardian ad litem, had appealed, we bypassed the standing issue and instead addressed and rejected the argument on the merits. *Id.* at ¶ 45. Second, Ryerson did not object to the trial court's preliminary pronouncement that he could not question witnesses. He did not request an opportunity to present opening or closing, did not attempt to question or call any witnesses other than himself, and was not prevented from testifying as a witness for his ward. Even assuming preventing Ryerson from questioning witnesses was error, there was no indication of prejudice sufficient to find plain error in *K.J.D.,* nor has it been made here. *Id.* at ¶ 50.

### B. Whether the Trial Court had Authority to Grant a Planned Permanent Living Arrangement

{¶ 18} Ryerson argues the trial court should have considered a PPLA as an alternative to granting permanent custody to FCCS. However, the Supreme Court of Ohio has held:

> After a public children services agency or private child placing agency is granted temporary custody of a child and files a motion for permanent custody, a juvenile court does not have the authority to place the child in a planned permanent living arrangement when the agency does not request this disposition. (R.C. 2151.353(A)(5), applied.)

*In re A.B.*, 110 Ohio St.3d 230, 2006-Ohio-4359, syllabus.

{¶ 19} The record reflects (and Ryerson does not contest) that FCCS never requested a PPLA in this case, that FCCS had temporary custody over A.H., and that FCCS had filed a motion for permanent custody. Thus, *In re A.B.* forecloses Ryerson's argument. Accordingly, we find it unnecessary to consider whether "The Evidence Before the Court Established That A.H. Would Be Eligible for an Order for a Planned Permanent Living Arrangement," because even if A.H. would have been eligible, the trial court lacked the power to adopt such an arrangement in the absence of a request from FCCS. (Ryerson's Brief, 27.) *Id.* at syllabus.

### IV. CONCLUSION

{¶ 20} Finding that Ryerson's arguments do not adequately support objections to the trial court's decision, we overrule his sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

KLATT and DORRIAN, JJ., concur.

————————————