JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Plaintiff City Life Development, Inc. ("City Life") appeals from the decision of the trial court that entered judgment for defendant Praxus and awarded it $32,217.73 on its counterclaim for breach of contract. For the reasons set forth below, we affirm.
 {¶ 2} On September 19, 2005, City Life, a developer and general contractor, filed suit against Praxus, a subcontractor who installed Hardie Board, a cement product, at Kings Terrace II North Building. In relevant part, City Life alleged that Praxus failed to pay the Hardie Board supplier and that an affidavit for mechanic's lien in the amount of $39,966.71 was placed on the property. City Life further alleged that it sustained losses for delays of the project and for slander of title and sought damages in the amount of $75,000 against Praxus. Praxus filed an answer denying liability and also set forth a counterclaim in which it alleged that City Life had breached the parties' contract for labor and materials.
 {¶ 3} The matter proceeded to trial on April 10, 2006. City Life presented testimony from City's Life's president John Rocco and foreman Daril Paukner. Rocco testified that the Phase II project consists of two residential buildings with a total of nine units. Rocco determined that the material to be used for the siding and trim for Phase II would be Hardie Board, a cement product. Bedrock Construction installed the siding and trim on the south building. Rocco sought a different *Page 4 
contractor to install the siding and trim on the north building, however, and also obtained bids from Praxus and Hornbeck.
 {¶ 4} Rocco selected Praxus and, pursuant to the terms of the parties' agreement, Praxus was to supply labor and materials, i.e, Hardie Board siding and trim throughout the structure, including corners, windows and doors, the frieze board, and the bottom of the building. City Life agreed to pay Praxus $56,341.44, with $8,451.16 as a down payment. Rocco further testified that the blueprints for the building were placed on a website to which Praxus and other contractors had access.
 {¶ 5} According to Rocco, any changes were to be in writing and approved by him. He admitted, however, that a provision in the contract states:
 {¶ 6} "When discrepancies to cost arise, this document and any subsequent documents and verbal agreements that become part of this project take precedence."
 {¶ 7} Rocco subsequently paid the down payment, plus three additional payments of $10,000 as the work progressed through March 2005. In March 2005, Thom Sutton of Praxus informed Rocco that there had been overruns and submitted an invoice for an additional $40,000. At this time, Rocco learned that Fagen's Building Centers Inc. ("Fagen"), the supplier of the Hardie Board and trim, had not been paid and intended to file a mechanic's lien on the property. Rocco insisted that Praxus adhere to the original terms of the contract and Praxus then walked off the *Page 5 
job. Fagen subsequently filed the lien, asserting that it was owed $39,966.71 in materials for the project.
 {¶ 8} According to Rocco, various items were uncompleted, including the car port ceilings, caulking, and the repair of nail holes. Rocco asserted that he had incurred costs exceeding $16,000 for labor and materials to complete the job. He admitted, however, that some of the receipts he provided to the court contained items unrelated to the Hardie Board siding and trim installation.
 {¶ 9} City Life's foreman, Darin Paukner, testified that Rocco was to approve all changes and that they were to be in writing. Praxus never presented Paulkner with any bills and he did not approve any changes. He acknowledged that Thom Sutton of Praxus informed him that he had ordered additional materials for the project but he told Sutton to speak with Rocco about it.
 {¶ 10} Praxus's evidence revealed that a drywall contractor, John Mancuso, referred Rocco to Thomas Sutton of Praxus. Sutton made quick calculations of "squares" and informed Rocco that, including labor and materials, it would do the job for $80,000. Rocco stated that this was too high. Mancuso testified that he asked Rocco if he had any information to give Sutton to help him revise his bid and Rocco provided him with Bedrock Construction's bid, which was $47,000. Sutton testified that Rocco asked him to look at Bedrock's bid. Without measuring the structure, Sutton reviewed the quantities listed in the Bedrock bid then lowered his own bid to $56,341.44, but he informed Rocco that he believed that the quantities listed in the *Page 6 
Bedrock bid were insufficient. Sutton acknowledged, however, that his contract did not list the quantities needed for each required item of siding and that the contract states that he reviewed the architectural drawings in calculating his bid.
 {¶ 11} Sutton next established that he sought a down payment of approximately $8,000 to begin the job, but Raymond Rocco, another principal John Rocco's father, would not agree, explaining that the bank requested that he first pay materials suppliers then pay for labor. John Rocco rejected both the down payment request and Raymond Rocco's proposed payment for materials first, but eventually paid $8,451.16 as a down payment, and later made three additional payments of $10,000. By February 2005, Praxus needed to order additional materials. John Rocco verbally assented but it was further agreed that Praxus would use materials left from the construction of the south building. Later, John Rocco asked the architect to determine the quantities of siding needed and, although the architect did not list each item that the job required, many of his calculations were comparable to the amounts that Sutton determined were needed once the job was underway, and substantially less than the amounts computed by Bedrock.
 {¶ 12} Sutton testified that he converted the contract to a "labor and materials" agreement after the dispute over the down payment. He asserted that he was owed $32,217.73 and would then pay the outstanding materials cost of $24,000 from this amount. He further established that he calculates his bids by determining the cost of *Page 7 
materials, doubling this to additionally reflect the cost of labor, and adding 10% for error and 10% for profit.
 {¶ 13} The trial court subsequently entered judgment in favor of Praxus as to all claims. In relevant part, the trial court found:
 {¶ 14} "7. Defendant informed Plaintiff that based on measurements that Defendant had performed, the cost of installing the Hardie Board would be between $80,000 and $85,000.
 {¶ 15} "10. Defendant * * * learned of the amount of Hardie Board tentatively needed as a result from this other bid.
 {¶ 16} "11. Plaintiff and Defendant subsequently entered into a revised agreement at a price for $56,341.44.
 {¶ 17} "12. The agreement * * * failed to mention the specific quantities of material.
 {¶ 18} "* * *
 {¶ 19} "16. The lien [filed by the supplier of the Hardie Board] is in the amount of $39,966.71, of which Plaintiff currently has paid $16,000 toward the lien's satisfaction.
 {¶ 20} "17. The labor and materials, when added together with overhead and profit at 10.00%, Defendant provided prior to discontinuing work, total $86,675.89. *Page 8 
 {¶ 21} "18. Plaintiff has previously paid Defendant $32,458.16 for the work already completed, along with $16,000[1] to the Hardie Board supplier, leaving an outstanding balance [for labor and materials] of $32,217.73 [which is to be paid by means of a joint check issued to Defendant and the mechanic's lien claimant, Fagen's Building Centers, Inc.].
 {¶ 22} "* * *
 {¶ 23} "The evidence clearly demonstrates that the parties entered into an oral agreement, as well as compensation for the additional materials and labor necessary for their installation * * * . Assuming arguendo, that the parties did not enter into an oral agreement, Defendant would still be entitled to the value of its work under the equitable doctrine of unjust enrichment."
 {¶ 24} City Life now appeals and assigns the following three interrelated errors for our review:
 {¶ 25} "The trial court erred in finding the contract ambiguous."
 {¶ 26} "The trial court erred in using parol evidence to define the terms of an unambiguous contract."
 {¶ 27} "In the event the contract was ambiguous, the trial court failed to read the terms of the contract against the drafting party." *Page 9 
 {¶ 28} The construction of contracts is a matter of law. Alexander v.Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241, 374 N.E.2d 146, paragraph one of the syllabus. When construing a contract, a court's principle objective is to ascertain and give effect to the intent of the parties. Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.,86 Ohio St.3d 270, 273, 1999-Ohio-162, 714 N.E.2d 898. "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." Kelly v. Medical Life Ins. Co. (1987),31 Ohio St.3d 130, 509 N.E.2d 411, paragraph one of the syllabus.
 {¶ 29} Alexander v. Buckeye Pipe Line Co., supra, set forth a test for determining whether contract terms are ambiguous. This test provides as follows:
 {¶ 30} "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument."
 {¶ 31} Id., at paragraph two of the syllabus.
 {¶ 32} Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions.Shifrin v. Forest Enterprises, Inc., 64 Ohio St.3d 635, 638,1992-Ohio-28, 597 N.E.2d 499. In this instance, the court must first examine parol evidence to determine the parties' intent. In re Estate ofTaris, Franklin App. No. 04AP-1264, 2005-Ohio-1516, citing Cline v.Rose (1994), 96 Ohio App.3d 611, 615, *Page 10 645 N.E.2d 806. Such extrinsic evidence may include: (1) the circumstances surrounding the parties at the time the contract was made; (2) the objectives the parties intended to accomplish by entering into the contract; and (3) any acts by the parties that demonstrate the construction they gave to their agreement. Blosser v. Carter (1990),67 Ohio App.3d 215, 219, 586 N.E.2d 253. However, when parol evidence cannot elucidate the parties' intent, a court must apply the secondary rule of contract construction whereby the ambiguous language is strictly construed against the drafter. Reida v. Thermal Seal, Inc., Franklin App. No. 02AP-308, 2002-Ohio-6968.
 {¶ 33} Finally, we note that the reformation of a contract is an equitable remedy through which an instrument is modified because a mutual mistake of the parties does not reflect their true intent.Mason v. Swartz (1991), 76 Ohio App.3d 43, 50, 600 N.E.2d 1121, citingGreenfield v. Aetna Casualty Co. (1944), 75 Ohio App. 122, 128,30 Ohio Op. 427, 61 N.E.2d 226. In this instance, the court is permitted to reform the agreement to embody the true intent of the parties. SeeAction Lumber Co., Inc. v. Equities Diversified, Inc., (July 22, 1975), Franklin App. No. 74AP-582.
 {¶ 34} Where a party seeks reformation of a contract, the intention of the parties can be discovered through parol evidence. Pepper Pike Props.L.P. v. Robert D. Wilson Co., L.P.A., Cuyahoga App. No. 79711, 2002-Ohio-331, citing Mason v. Swartz, supra. See, also, Cuthbert v.Trucklease Corp., Franklin App. *Page 11 
No. 03AP-662 2004-Ohio-4417, citing Rosen v. Westinghouse Elec. SupplyCo. (C.A.8, 1957), 240 F.2d 488, 491 (it is not necessary, as a prerequisite to the reformation of an instrument to conform to the intention of the parties, that the instrument on its face be ambiguous).
 {¶ 35} Similarly, parol evidence may be used to establish that there has been a mutual mistake. Cuthbert v. Trucklease Corp., supra, citingWilliams Trucking, Inc. v. Gable (June 8, 2000), Cuyahoga App. No. 75614. Mutual mistake must be proven by clear and convincing evidence.Pepper Pike Props. L.P. v. Robert D. Wilson Co., L.P.A., supra, citingCastle v. Daniels (1984), 16 Ohio App.3d 209, 475 N.E.2d 149, 152. Case law suggests that the trier of fact may consider subsequent conduct of the parties as evidence of mutual mistake at the time of the execution of an agreement. Fada v. Information Sys. Networks Corp. (1994),98 Ohio App.3d 785, 790, 649 N.E.2d 904
 {¶ 36} Moreover, it is not essential that the party seeking the reformation of a contract show that he is wholly free from fault.Cuthbert v. Trucklease Corp., supra, citing Crout v. D.E.R. Bldg.Co. (Nov. 13, 2001), Brown App. No. CA2000-12-039; Haven House Manor,LTD v. Gabel, Wood App. No. WD-02-073, 2003-Ohio-6750.
 {¶ 37} Our decision is further informed by the following provisions of the Restatement, Second, of Contracts:
 {¶ 38} "§ 152 When Mistake of Both Parties Makes a Contract Voidable *Page 12 
 {¶ 39} "(1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.
 {¶ 40} "(2) In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise."
 {¶ 41} "§ 154 When a Party Bears the Risk of a Mistake
 {¶ 42} "A party bears the risk of a mistake when
 {¶ 43} "(a) the risk is allocated to him by agreement of the parties, or
 {¶ 44} "(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
 {¶ 45} "(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.
 {¶ 46} "COMMENTS ILLUSTRATIONS:
 {¶ 47} "Comment c:
 {¶ 48} "Conscious ignorance. Even though the mistaken party did not agree to bear the risk, he may have been aware when he made the contract that his knowledge with respect to the facts to which the mistake relates was limited. If he *Page 13 
was not only so aware that his knowledge was limited but undertook to perform in the face of that awareness, he bears the risk of the mistake. It is sometimes said in such a situation that, in a sense, there was not mistake but `conscious ignorance.'
 {¶ 49} "§ 157 Effect of Fault of Party Seeking Relief
 {¶ 50} "A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation under the rules stated in this Chapter, unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.
 {¶ 51} "§ 153 When Mistake of One Party Makes a Contract Voidable
 {¶ 52} "Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and
 {¶ 53} "(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or
 {¶ 54} "(b) the other party had reason to know of the mistake or his fault caused the mistake."
 {¶ 55} Applying all of the foregoing to this matter, we conclude that the trial court correctly determined, by clear and convincing evidence, that the parties made a mutual mistake as to the quantities of materials which would be needed for the project. The record indicates that John Rocco submitted the Bedrock bid to Praxus *Page 14 
as a guide for the preparation of its bid and that Praxus used the amounts of materials set forth in the Bedrock bid to prepare its revised bid and to order materials. Although Praxus relied upon Bedrock's computations and did not make its own, this does not bar reformation in this instance as it was not shown that Praxus failed to act in good faith.
 {¶ 56} Moreover, the mistake was mutual rather than unilateral since Rocco believed that the amounts as outlined in the Bedrock bid were accurate and Praxus accepted this assumption in revising its bid. The mistake was significant as the evidence established that the final material costs were roughly double the amount initially contemplated. Finally, although Praxus was to determine the amounts of materials needed, the risk cannot be allocated to Praxus under the unique circumstances of this case since Rocco provided the Bedrock bid to Praxus and this contained incorrect amounts. Thus, while Praxus may have had limited information, Rocco's conduct contributed to Praxus's belief that its information was sufficient.
 {¶ 57} In accordance with the foregoing, we find no error insofar as the trial court considered parol evidence to determine the parties' true intent and reform the agreement following their mutual mistake. Finally, because parol evidence could elucidate the parties' intent, the trial court was not required to apply the secondary rule of contract construction whereby the ambiguous language is strictly construed against the drafter. See Reida v. Thermal Seal, Inc., supra.
 {¶ 58} The assignments of error are overruled. *Page 15 
Affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA ANN BLACKMON, J., CONCURS.
CHRISTINE T. MCMONAGLE, P.J., CONCURS IN JUDGMENT ONLY
[1] We assume for purposes of this appeal that Plaintiff has paid only the $16,000 listed above. If this is incorrect or if additional amounts have been paid, we urge Plaintiff to seek correction in the lower court. *Page 1