[Cite as *Home S. & L. Co. of Youngstown, Ohio v. Norfolk S. Ry. Co.*, 2012-Ohio-1634.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 96878**

## THE HOME SAVINGS & LOAN COMPANY OF YOUNGSTOWN, OHIO

PLAINTIFF-APPELLANT

vs.

## NORFOLK SOUTHERN RAILWAY COMPANY

DEFENDANT-APPELLEE

### JUDGMENT:
### REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case No. CV-714634

**BEFORE:**    Boyle, P.J., Sweeney, J., and Keough, J.

**RELEASED AND JOURNALIZED:**    April 12, 2012

**ATTORNEYS FOR APPELLANT**

Jerry R. Krzys
Richard J. Thomas
Henderson, Covington, Messenger, Newman & Thomas Co., L.P.A.
6 Federal Plaza Center, Suite 1300
Youngstown, Ohio    44503


**ATTORNEYS FOR APPELLEE**

Timothy T. Brick
Colleen A. Mountcastle
Joseph J. Santoro
Gallagher Sharp
6th Floor Bulkley Building
1501 Euclid Avenue
Cleveland, Ohio    44115

MARY J. BOYLE, P.J.:

{¶1} Plaintiff-appellant, The Home Savings & Loan Company of Youngstown, Ohio ("Home Savings"), appeals from a trial court judgment denying its partial motion for summary judgment on liability and granting summary judgment to defendant-appellee, Norfolk Southern Railway Company ("Norfolk Southern"). Home Savings raises one assignment of error for our review, namely, that the trial court erred in granting summary judgment to Norfolk Southern and denying its motion. We find merit to the appeal, and reverse and remand for a hearing on the amount of damages that Norfolk Southern should pay Home Savings for anticipatorily breaching their agreement.

Procedural History and Factual Background

{¶2} In March 2008, Home Savings and Norfolk Southern entered into an Agreement to Assign Bid in Foreclosure Sale ("Agreement"). In it, Home Savings agreed to "credit bid" for property sold at a sheriff's sale "known as Permanent Parcel Nos. 784-13-001 and 812-01-003 (collectively 'the Property')." If Home Savings was the successful bidder, then it promised to assign its bid to Norfolk Southern for $600,000. The Agreement further described the Property as:

{¶3} "[T]he Property is the subject of a foreclosure action in the Court of Common Pleas, Cuyahoga County, Ohio, known as Case No. CV 06 585410, entitled '*Plymouth Park Tax Services, LLC v. Divine Management, Inc., et al.*' (the 'Foreclosure Action')[.]"

{¶4} The Foreclosure Action was a tax lien foreclosure action filed in February 2006 by Plymouth Park Tax Services ("Plymouth Park") against, among others, Divine Management Company ("Divine") for two parcels of land; PPNs 784-13-001 and 812-01-003. The preliminary judicial report ("PJR") prepared by Chicago Title Agency and incorporated into Plymouth Park's complaint, however, incorrectly described PPN 812-01-003 as encompassing the land contained not only in PPN 812-01-003, but also the land contained in PPNs 812-01-002 and 784-13-002 (the incorrect legal description did not explicitly list these parcel numbers; it just included their legal descriptions). Home Savings was listed as a defendant in the Foreclosure Action because it had a mortgage interest in the Divine parcels as security for loans it issued to Divine in 2003.

{¶5} The incorrect legal description in the Foreclosure Action was not discovered until June 2008, three months after Home Savings and Norfolk Southern entered into their Agreement. That June, an attorney for Carnegie Company (who was a defendant in the foreclosure action as well because it also had an interest in the Divine parcels) sent an email to Robert Fulton, Home Savings' attorney, stating that the legal description of the Property in the Foreclosure Action "covers vastly more [than] just PPNs 812-[01]-003 and 784-13-001." As a result, Carnegie's attorney sent the legal description to U.S. Title Agency to investigate the issue.

{¶6} In late July 2008, Fulton received an email from an agent at U.S. Title explaining that the legal description in the Foreclosure Action for PPN 812-01-003

needed to be amended to remove the legal descriptions of the extra parcels. In early August 2008, the trial court in the Foreclosure Action granted Carnegie's motion to modify the decree of foreclosure and amend the praecipe (order of sale) to correct the legal description of PPN 812-01-003. Fulton sent copies of these documents modifying the legal description of PPN 812-01-003 to George Pofok, Norfolk Southern's real estate agent, in September 2008, stating "[t]his should not affect our agreement, which refers to the property simply by permanent parcel number."

{¶7} In November 2008, Norfolk Southern sent a letter to Home Savings indicating that it was no longer interested in purchasing the Property "due to the extended period of time which [had] passed without any foreclosure sale having occurred." A month later, Norfolk Southern sent a second letter to Home Savings formally rescinding the Agreement due to a "misunderstanding of fact" between the parties at the time they entered into the contract. Specifically, Norfolk Southern stated, "[i]t is clear that at the time Norfolk Southern and [Home Savings] signed the [Agreement], both parties believed that Parcel No. 812-01-003 was much larger than the corrected description."[1]

{¶8} Home Savings brought an action for breach of contract against Norfolk Southern in January 2010, alleging that Norfolk Southern had anticipatorily breached the Agreement. Both parties moved for summary judgment. Norfolk Southern claimed

---

[1] More facts will be set forth as needed in the argument and analysis section of this appeal.

that it and Home Savings were materially mistaken as to the size and boundaries of the Property that was subject to the Agreement. Home Savings moved for partial summary judgment as to liability on its breach of contract claim, and requested a hearing on damages.

{¶9} The trial court granted Norfolk Southern's motion for summary judgment and denied Home Savings' motion. It is from this judgment that Home Savings appeals, arguing that the trial court erred in doing so.

Standard of Review

{¶10} Summary judgment motions are to be resolved in light of the dictates of Civ.R. 56. This rule was reaffirmed by *State ex rel. Zimmerman v. Tompkins*, 75 Ohio St.3d 447, 448, 663 N.E.2d 639 (1996):

> Civ.R. 56(C) provides that before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex rel. Parsons v. Fleming*, 68 Ohio St.3d 509, 511, 628 N.E.2d 1377 (1994), citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

{¶11} As an appellate court reviewing summary judgment motions, we must stand in the shoes of the trial court and review summary judgments by the same standard and evidence as the trial court. *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 506 N.E.2d 212 (1987).

Parol Evidence Rule

**{¶12}** The main issue presented in this appeal is whether there was a mutual mistake as to a material part of the Agreement between Home Savings and Norfolk Southern, such that Norfolk Southern was entitled to rescind the Agreement. The trial court relied on extrinsic evidence to find that the parties were mistaken as to the size and boundaries of the Property when they entered into the Agreement. Home Savings contends that the trial court erred when it considered extrinsic evidence because the contract is unambiguous on its face.

**{¶13}** The parol evidence rule excludes extrinsic evidence "because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself." *Galmish v. Cicchini*, 90 Ohio St.3d 22, 27, 734 N.E.2d 782 (2000), quoting 11 Williston on Contracts (4 Ed.1999) 569-570, Section 33:4. The principal purpose of the parol evidence rule is to protect the integrity of written contracts. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 440, 662 N.E.2d 1074 (1996). By prohibiting evidence outside the four corners of the agreement, the rule seeks to ensure the stability, predictability, and enforceability of finalized written instruments. *Id*.

**{¶14}** But in this case, Norfolk Southern maintains that there was a mutual mistake as to a material part of the contract. A mutual mistake of fact results in a lack of a meeting of the minds. *Robert's Auto Ctr., Inc. v. Helmick*, 9th Dist. No. 21073,

2003-Ohio-640, ¶ 31, fn. 1. It "calls into question the very existence of the contract," *Reitz v. West*, 9th Dist. No. 19865, 2000 WL 1226617, *6 (Aug. 30, 2000). Therefore, parol evidence is admissible to demonstrate a mutual mistake. *City Life Dev., Inc. v. Praxus Group, Inc.*, 8th Dist. No. 88221, 2007-Ohio-2114, ¶ 35.

{¶15} Accordingly, we find that the trial court did not err when it considered extrinsic evidence to determine whether a mutual mistake existed. We must now consider the evidence de novo to determine whether there was a mutual mistake as to the size and boundaries of the Property subject to the Agreement.

### Mutual Mistake

{¶16} In *Reilley v. Richards*, 69 Ohio St.3d 352, 352-353, 632 N.E.2d 507 (1994), the Ohio Supreme Court explained:

> [T]he doctrine of mutual mistake is a ground for the rescission of a contract under certain circumstances. In *Irwin v. Wilson*, 45 Ohio St. 426, 15 N.E. 209 (1887), [this court] held that a buyer is entitled to rescission of a real estate purchase contract where there is a mutual mistake as to a material part of the contract and where the complaining party is not negligent in failing to discover the mistake. A mistake is material to a contract when it is "a mistake * * * as to a basic assumption on which the contract was made [that] has a material effect on the agreed exchange of performances." 1 Restatement of the Law 2d, Contracts, Section 152(1) (1981). Thus, the intention of the parties must have been frustrated by the mutual mistake.

{¶17} When determining whether there was a mutual mistake, the trial court must review the parol evidence to determine if there was a meeting of the minds as to a material part of the contract. *City Life Dev.* at ¶ 35. Such extrinsic evidence may

include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement. *Id*.

{¶18} It is the complaining party's burden to establish by clear and convincing evidence that a mutual mistake exists. *See Quintella v. Smith*, 5th Dist. No. 1999CA00237, 2000 WL 873852, *1-2 (June 12, 2000). The following case law demonstrates what is required to establish mutual mistake.

{¶19} In *Reilly*, 69 Ohio St.3d 352, 632 N.E.2d 507, the Ohio Supreme Court held that a mutual mistake existed as to a material part of the purchase contract, entitling the buyer to rescind the contract. *Id*. at 352. The buyer purchased property intending to build a family home. After the parties signed the purchase contract, the buyer discovered that more than half of the property was located in a "flood hazard area." Neither the buyer nor the seller knew that the property was in a flood zone at the time they entered into the contract. Other evidence established that it was illegal to build in the floodway or within 20 feet of the boundaries of it, and that while building might be permitted elsewhere on the property, it depended on the impact to the stream. Further, because of the flood zone, the builder said he would not build on the property because he could not warrant the property for one year, consistent with standard building practice. The Ohio Supreme Court concluded that "lack of knowledge that a significant portion of

the lot is located in a floodway is a mistake of fact of both parties that goes to the character of the property such that it severely frustrates the appellant's ability to build a home on the property." *Id*. at 353. The Ohio Supreme Court further concluded that the buyer was not negligent for not hiring engineers to discover the flood plain (the buyer had the property inspected, but the flood plain could not have been discovered by simply looking at the property). *Id*. at 354.

**{¶20}** In *Thomas v. Ohio Power Co.*, 7th Dist. No. 06CA840, 2007-Ohio-5350, the Thomases granted an easement to Ohio Power Company so that Ohio Power could supply power to the Thomases' new neighbors. In reliance on the easement, Ohio Power cleared many trees that grew on the Thomases' property. After this occurred, Ohio Power discovered that the neighbor's home was not located within its service area; it was located within Carroll Rural Electric Power's service area. Ohio Power attempted to but was not successful in obtaining permission from Carroll Rural Electric to provide service to that area. The Seventh District held that both parties "expected that Ohio Power would be able to provide electric power to the neighbor when the parties entered into the contract," and as such, a mutual mistake existed that frustrated the purpose of the contract. *Id*. at ¶ 35. The court also explained that "Ohio Power, rather than the Thomases, was in the best position to know this mistaken fact when the parties entered into the contract." *Id*. at ¶ 38.

**{¶21}** In its summary judgment motion, Norfolk Southern first argued that the

evidence established as a matter of law that a mutual mistake existed because of the incorrect legal description of the Property in the Foreclosure Action (which if the evidence supports it, would mean they believed they were getting the four Divine parcels, not the just the two that were explicitly listed). Norfolk Southern then argued in its summary judgment motion that it "believed that the Assignment Agreement included all of the Divine parcels based on past negotiations and its own investigation." We will address these arguments separately.

Incorrect Legal Description

{¶22} Norfolk Southern argued that a mutual mistake of fact existed as to the size and boundaries of the Property subject to the Agreement because "Home Savings mistakenly relied on the legal description of the Property filed in the Foreclosure Action, which encompassed all four Divine Parcels." Norfolk Southern maintains to this court that it was Home Savings' reliance on the incorrect legal description "where a fundamental misunderstanding arose between Home Savings and Norfolk Southern." Although Norfolk Southern acknowledges that Home Savings did not even know about the incorrect legal description until June 2008 — three months *after* the Agreement was signed — it still claims that Home Savings continued to rely on this incorrect legal description prior to, throughout, and after negotiations with Norfolk Southern. It is because of Home Savings' reliance on the incorrect legal description that Norfolk Southern contends led both parties to be mistaken as to what Property was included in the

Agreement.

{¶23} Home Savings does not deny that the legal description in the Foreclosure Action was incorrect or that it blindly adopted the incorrect description and used it in its pleadings in the Foreclosure Action. But Home Savings counters that it was never mistaken as to what Property was included in the Agreement — the two parcels, PPNs 784-13-001 and 812-01-003, that were subject to the foreclosure action and explicitly listed in the Agreement. Home Savings contends that the incorrect legal description in the Foreclosure Action is irrelevant to the Agreement because the Agreement defined the Property by PPNs, without any reference to the Property's location, size, or boundaries.

{¶24} Home Savings further maintains that the evidence Norfolk Southern pointed to in its summary judgment motion regarding mutual mistake due to incorrect legal description establishes that neither Fulton (Home Savings' attorney who negotiated the Agreement with Norfolk Southern) nor Paul Rhodes (assistant vice president at Home Savings who signed the Agreement) were mistaken as to what Property was included in the Agreement.

{¶25} Fulton testified repeatedly in his deposition that he did not understand legal descriptions of property or know how to read them because he is "not a title man." He explained that when he was talking to George Pofok, Norfolk Southern's outside real estate agent, about purchasing the Property, he "wasn't thinking in terms of legal descriptions, [he] was thinking that the Property was the parcels that were included in the

foreclosure." When asked when he sent the Agreement to Pofok whether he understood that the legal description of the Property was what was contained in the PJR, Fulton replied,

> I didn't really have any understanding about the legal description.
> That's why I chose parcel numbers to identify the Property, because, as I've said two or three times, I'm not a title expert and I don't even know how to read a legal description and understand it clearly, so I just chose parcel numbers to describe the property.

**{¶26}** When Rhodes was asked in his deposition what his understanding was of the legal description for PPN 812-01-003 at the time he executed the Agreement on behalf of Home Savings, he replied, "that was what was involved in the description of the parcel numbers * * * in the Foreclosure Action. I didn't do a survey or do a metes and bounds or anything on it." Norfolk Southern claims Rhodes's answer means that "at the time of execution, [Rhodes] believed the property subject to the [Agreement] included all of the property that was described in the filings submitted to the court in the Foreclosure Action." We disagree with Norfolk Southern's interpretation of Rhodes's response. Rhodes explained several times in his deposition that he understood the Agreement to include the property that was subject to the foreclosure. But earlier in his deposition, Rhodes testified that he did not even know about the incorrect legal description until it was discovered later by Carnegie. And Norfolk Southern does not even dispute the fact that no one at Home Savings knew about the incorrect legal description until June 2008.

**{¶27}** In its motion for summary judgment, Norfolk Southern did not point to *any*

*other* evidence in the record — besides Fulton's and Rhodes's testimony — showing that it or Home Savings' relied on the incorrect legal description leading to a mutual mistake in the Agreement.

## Past Negotiations

**{¶28}** Norfolk Southern also argued in its summary judgment motion that it "believed that the Assignment Agreement included all of the Divine Parcels based on past negotiations and its own investigation." All of the Divine parcels included the two parcels explicitly listed in the Agreement, and the two whose legal descriptions were incorrectly included in the legal description of PPN 812-01-003 in the Foreclosure Action.

**{¶29}** At the outset, we note that Norfolk Southern further argues *on appeal* that it also believed from past negotiations that the Agreement included the remaining four Carnegie parcels as well as the four Divine parcels, for a total of eight parcels of land. But Norfolk Southern *did not argue* this to the trial court in its summary judgment motion; it only discussed the four Carnegie parcels in relation to its assertion that it was not negligent in discovering the mistake, but not in relation to its mutual mistake argument. An argument not raised to the trial court cannot be raised for the first time on appeal. *Burden v. Lucchese*, 3d Dist. No. 1-09-36, 2010-Ohio-3363, ¶ 7.[2]

---

[2]Even if we were to address Norfolk Southern's argument that the Agreement also included the four Carnegie parcels, it has no merit. Although one could reasonably entertain the argument that past negotiations led to a mutual mistake in the Agreement regarding the four Divine parcels

**{¶30}** Regarding Norfolk Southern's argument that based on past negotiations it believed that it would receive the four Divine parcels in the Agreement, Norfolk Southern points to a series of July 2007 emails from Bob Fulton (Home Savings' attorney) to George Pofok (Norfolk Southern's outside real estate agent) and Jerry Causey (Norfolk Southern's in-house real estate attorney).

**{¶31}** Specifically, on July 25, 2007, Fulton sent the following email to Pofok proposing the deal:

> [Norfolk Southern] will commit to purchase the entire property without the lot split, for the sum of $600,000.00. The property will be sold at sheriff's sale as soon as procedurally feasible, most likely by mid October, free of all liens. Home Savings will bid at the sheriff's sale up to the total of its payoff, plus taxes, costs, and an agreed upon amount of $150,000 to be paid to Carnegie out of the sale of the proceeds. Home Savings will assign its bid to [Norfolk Southern] for the sum of $600,000.00[.]

**{¶32}** After quoting Fulton's email, Norfolk Southern states to this court, "Importantly, at the time Mr. Fulton wrote this email, he was still mistakenly relying on the PJR's incorrect legal description, which subjected all four of the Divine Parcels to the foreclosure action." But again, this was 2007 — long before Home Savings knew of the incorrect legal description (an undisputed fact). Thus, we fail to see how Home Savings

---

(which we will do here), one could not logically extend that argument that it led to a mutual mistake regarding the four Carnegie parcels as well. To do so would be pushing all rational boundaries. Even if Norfolk Southern executives, real estate managers, and attorneys believed — unilaterally after negotiations — that the Agreement contained eight parcels of land, when they saw that the Agreement only listed the two parcels, they should have at least raised questions at that point before signing it.

could be "relying" on it.

**{¶33}** Norfolk Southern then points to several *internal emails* between *its own* executives — emails between Robert Siik (group manager of assets and services) and John Foley (Norfolk Southern's internal real estate manager for the Cleveland territory), as well as emails between these same Norfolk Southern executives and *Pofok*, questioning what property this "deal" encompassed. Siik, after receiving a draft of the Agreement listing *only* the two parcels, asked Foley, "would $600,000 get us ALL of the remaining 'Carnegie-Divine' property east of the 10 acres we already own?" Foley responded "yes."

**{¶34}** But again, Foley worked for Norfolk Southern; this was a communication between Foley and Siik. This does not establish that Home Savings was mistaken. Indeed, there are *no emails* from Norfolk Southern to Home Savings expressing *any confusion as to how many parcels* Norfolk Southern would be receiving in the deal. And Norfolk Southern's unilateral belief (i.e., mistake) does not equate to a mutual mistake.

**{¶35}** Norfolk Southern next points to a July 27, 2007 email from Jerry Causey (Norfolk Southern's in-house real estate attorney) to Fulton, asking him to "clarify a few matters" regarding Fulton's July 25, 2007 email to Pofok proposing the deal. *See* Fulton's email, *supra*. Causey asked Fulton:

In your email, you state that the property will be sold at sheriff's sale "free of all liens." I understand that there are several liens, including tax liens that have been sold to Plymouth Tax Service (?), which amount to over $100K, a CEI lien which amounts to over $65K, a water bill lien and an option/right of first refusal agreement belonging to

Carnegie Properties. What will occur with these encumbrances? We are currently having our title work updated to make sure there are no other problems that have arisen.

You also state that Home Savings will bid up to the total of its payoff, plus taxes, costs and $150K to be paid to Carnegie. Will the $600K from NS cover all these costs? What is the amount of the payoff, taxes and costs? *What is the purpose of the payment to Carnegie?* (Emphasis added to highlight what Norfolk Southern stresses in its argument here.)

**{¶36}** Fulton replied, explaining that Home Savings' payoff, taxes, costs, and "carve out to Carnegie," amounted to $962,303.70. Fulton explained that regardless of that amount, Norfolk Southern's payment would be $600,000. Fulton then stated — and this is the *one email and one sentence* that Norfolk Southern places so much emphasis on to claim that Home Savings was mistaken as to the boundaries and size of the Property: "The carve out to Carnegie is to settle the right of first refusal/lot split issues and permit the sale to go forward as quickly as feasible."

**{¶37}** To understand the "lot split issue," more background information is necessary. In 2005, Norfolk Southern decided to expand its transportation "intermodal" facility, or its "staging lot," where containers are unloaded from a train and placed in a staging area to await further transportation by truck. With that purpose in mind, Norfolk Southern entered into a Purchase Option contract with Carnegie to purchase eight parcels of land for $1,250,000 amounting to approximately 16 acres. Norfolk Southern later learned, however, that Carnegie did not own two of the eight parcels; Divine did. And to complicate matters further, Norfolk Southern also learned that Divine owned two adjacent parcels that were in foreclosure. Despite these complications, Norfolk Southern opted to purchase two of the Carnegie parcels (that were subject to the Purchase Option)

amounting to ten acres in late 2005.

**{¶38}** To further add to the complexity of the issues, Norfolk Southern also discovered that a dilapidated apartment complex straddled one of the Divine parcels that was subject to the Purchase Option Agreement with Carnegie (although the record is not entirely clear as to how, Carnegie had an interest in the Divine parcels) and one of the Divine parcels that was not subject to the Purchase Option Agreement with Carnegie (this parcel was one of the two subject to the foreclosure action — PPN 784-13-001). Norfolk Southern intended to demolish any buildings that were on the land it purchased so that it could expand its "intermodal" facility. And it could not obviously demolish half of a building.

**{¶39}** Thus, to purchase the remaining parcels from Carnegie under the Purchase Option, the parcel with part of the apartment complex — *that was subject to the Purchase Option* — needed to be split (meaning the parcel that was not subject to the Purchase Option became larger and wholly contained the apartment building). After the lot split, Norfolk Southern would then be purchasing a parcel that became smaller and did not contain any part of the building. The other possibility to effectuate its purpose was that Norfolk Southern could also purchase the parcel that contained the other half of the apartment complex (the one not subject to the Purchase Option, but subject to the foreclosure action).

**{¶40}** Norfolk Southern first attempted to obtain approval for the lot split from the

cities of Bedford and Maple Heights, as the properties also bordered both cities (as if the matter were not complicated enough). Maple Heights ultimately approved the lot split, but Bedford did not. In late 2006, Norfolk Southern entered into three-party negotiations with Carnegie and Home Savings to try to purchase all of the property, including the six remaining parcels subject to the Purchase Option (four owned by Carnegie and two owned by Divine), as well as the two Divine parcels subject to the foreclosure action (eight parcels of land total). But the three-party negotiations fell apart and the Purchase Option expired on December 31, 2006.

{¶41} Norfolk Southern maintains that because of Fulton's answer, "[t]he Norfolk Southern Representatives reasonably interpreted this statement to have its apparent meaning — that no lot split would be necessary because Norfolk Southern would receive all four Divine Parcels." They further claim, "Norfolk Southern logically interpreted Mr. Fulton's proposal to include all four Divine Parcels because *all four Divine Parcels had to be included to settle the lot split issue.*" (Emphasis is Norfolk Southern's.)

{¶42} But after reviewing the convoluted background of this case, this court does not agree with Norfolk Southern that the "apparent meaning" of Fulton's response to Causey's question was that "no lot split would be necessary because Norfolk Southern would receive all four Divine Parcels." Indeed, Fulton's email proposal to Pofok was that the property Norfolk Southern was purchasing "will be sold at sheriff's sale as soon as procedurally possible[.]" And the final written agreement spells out in detail that

Home Savings "is the owner and holder of two (2) mortgages against certain real property * * * known as Permanent Parcel Nos. 784-13-001 and 812-01-003 (collectively 'the Property')." The Agreement further states "the Property is the subject of a foreclosure action" and it spells out that Home Savings would bid on the Property at the sheriff's sale. Home Savings was not offering to bid on four parcels of land. And *despite the incorrect legal description*, only two parcels of land were subject to foreclosure, not four. (*See discussion infra* regarding "Other Evidence Supporting Lack of Mutual Mistake.")

**{¶43}** Moreover, even assuming that Norfolk Southern representatives were reasonable in interpreting Fulton's response to mean that they would be receiving the four Divine parcels, this does not create a question of fact as to *mutual mistake*. It may create a question of fact as to unilateral mistake or as to other claims against Home Savings (if Fulton was attempting to intentionally mislead Norfolk Southern representatives), but not mutual mistake. There is simply no evidence that Home Savings was mistaken as to the amount of land that was included in the agreement.

**{¶44}** In sum, Norfolk Southern has not put forth any evidence establishing that either party — it or Home Savings — ever mistakenly believed that the Property actually included the extra parcels of land as incorrectly described in the foreclosure action. Home Savings blindly copying the legal description in its filings in the foreclosure action does not establish that it ever believed the Property included all of the land described.

<u>Norfolk Southern's Remaining Arguments</u>

A. *Listing the Property by PPNs is not Determinative*

**{¶45}** Norfolk Southern argues that "even if the Agreement had only described the Property by PPNs, *listing the PPNs is in no way determinative, or even relevant, to whether Home Savings was mistaken as to the size and dimensions of the land encompassed by those PPNs*." (Emphasis is Norfolk Southern's.) Norfolk Southern states:

> For example, imagine two parties contract for the sale of land located at 123 Tory Ave, but both parties mistakenly believe that the land includes "x" amount of acres, when in reality it only includes "y" amount of acres. When the parties' mistake is realized, the simple fact that the parties identified the land by address is irrelevant to whether there was a meeting of the minds. The selling party may not opportunistically ignore its own mistake and claim that whatever land is actually encompassed by the property's address is the land the buyer is required to purchase.

**{¶46}** In support of its hypothetical, Norfolk Southern cites to *Thomas*, 2007-Ohio-5350, in support (we discussed the facts of this case *supra*). But in its example, as well as in *Thomas*, the party seeking to rescind the purchase agreement established that there was a *mutual mistake* regarding the property. In Norfolk Southern's hypothetical, "*both parties* mistakenly believe that the land includes 'x' amount of acres, when in reality it only includes 'y' amount of acres." (Emphasis added.) Likewise, in *Thomas*, the Seventh District held that there was a mutual mistake because both parties "expected that Ohio Power would be able to provide electric power to the neighbor when the parties entered into the contract. This was a mistaken belief and that mistake frustrates the purpose of the contract." *Id*. at ¶ 35.

{¶47} But in the present case, Norfolk Southern has not established that a *mutual mistake* existed at the time the parties entered into the Agreement. Specifically, Norfolk Southern has not established that *both parties*, it and Home Savings, *understood the Agreement that listed two parcels to actually include four, or even eight parcels of land*. And significantly, this is not analogous to *Thomas*, where one party was in a better position to know what land that was actually included. Indeed, Norfolk Southern had highly experienced real estate attorneys and agents involved in the negotiations and reviewing this Agreement, namely, its own outside real estate agent (Pofok), its own in-house real estate attorney (Foley), and its own real estate manager (Causey).

B. *Reliance on Outside Title Company*

{¶48} Norfolk Southern also argues that it hired Chicago Title Company to review the Agreement before it signed it and confirm what property it would be receiving. Norfolk Southern claims that even the title company confirmed that it was getting the four Divine parcels. But notably, Chicago Title was the exact title company — used by Plymouth Park in the Foreclosure Action — that got the legal description wrong in the first place. Thus, Norfolk Southern may have legal redress against Chicago Title, but not Home Savings.

C. *Windfall Argument*

{¶49} Norfolk Southern further argues that Home Savings "attempts to convert the parties' mutual mistake into a potential windfall." Because the Property (i.e., the two

parcels of land) only appraised and sold for $98,000 at the sheriff's sale in December 2008, Norfolk Southern claims that is evidence that it would have never agreed to pay $600,000 for property that essentially amounted to two acres of land, and was appraised and sold for $98,000 in December 2008.  This argument is moot, however, because we have concluded that no mutual mistake exists.   Nonetheless we will briefly address it.

{¶50} Home Savings specifically points to evidence in the record that directly refutes Norfolk Southern's assertion.  For example, a November 2006 email from Pofok to Norfolk representatives (Causey, Siik, and Foley) that states, "I spoke with the lender for Divine Management and he told me if he got +/- $500K they could convince Divine Management to sell the property and we wouldn't need a lot split and could close ASAP.  The site totals 2.1187 acres."   The two parcels subject to the foreclosure action amounted to 2.1 acres.

{¶51} When Foley reviewed Pofok's email, he handwrote on the printed copy of the email, "$235,993.76 per ac."   Pofok testified in his deposition that when he wrote the email, he believed the 2.1187 acres referred to PPNs 812-01-003 and 784-13-001 — the two parcels listed in the Agreement and subject to the foreclosure action.  Replying to Pofok's email regarding the "+/- $500K," Causey states, "very interesting," and asks Siik, "Rob — Is this something we would consider?  Do we have that kind of money budgeted?  Note the per acre price is $235,993.76 not taking into consideration the

improvements." To Pofok, Causey asks, "George — Do you think the lender/Divine Management would accept less?"

{¶52} Although "+/- $500K" does not equal $600,000, it is certainly far more than $98,000. Thus, Norfolk Southern's argument is without merit.

Other Evidence Supporting Lack of Mutual Mistake

{¶53} We further note that Plymouth Park was the owner and holder of *two tax certificates*, one for PPN 784-13-001 and one for PPN 812-01-003, due to tax delinquencies on the parcels. The tax certificates at issue here were purchased under R.C. 5721.33 and therefore were governed by R.C. 5721.37(A)(1). That section provides in relevant part that

> a certificate holder * * * may file with the county treasurer * * * a notice of intent to foreclose, * * * provided the certificate parcel has not been redeemed * * * and at least one certificate respecting the certificate parcel, held by the certificate holder filing the request for foreclosure or notice of intent to foreclose and eligible to be enforced through a foreclosure proceeding, has not been voided * * *[.]

{¶54} R.C. 5721.35(A) further provides that "the tax certificate vests in the certificate holder the first lien previously held by the state * * *, superior to all other liens and encumbrances upon the parcel described in the tax certificate * * * , in the amount of the certificate redemption price * * *."

{¶55} Plymouth Park's Foreclosure Action explicitly stated that it applied to "Cuyahoga County Auditor's Permanent Parcel No. 784-13-001 and Permanent Parcel No. 812-01-003." Plymouth Park did not own tax certificates for the other two parcels

incorrectly included in the legal description of PPN 812-01-003. Although the legal description in the PJR filed with the Foreclosure Action incorrectly described PPN 812-01-003, that does not mean that more property was subject to foreclosure. Plymouth Park could not foreclose on property for which it had no interest. Nor did the improper legal description invalidate the Foreclosure Action in any way. *See Plymouth Park Tax Servs., LLC v. Natl. Apt. Complex*, 8th Dist. No. 94145, 2010-Ohio-4356 (this court upheld the trial court's judgment granting decree of foreclosure in a tax lien foreclosure action despite the fact that the tax certificates contained an incorrect legal description of the property). Thus, the incorrect legal description in the PJR here had no bearing on the Agreement between Home Savings and Norfolk Southern.

{¶56} We conclude that Home Savings established as a matter of law that it was not mistaken as to the size and boundaries of the Property in the Agreement, i.e., it consisted of the two parcels plainly listed in the Agreement. Accordingly, we conclude that the trial court erred when it granted Norfolk Southern's summary judgment motion and denied Home Savings' motion.

{¶57} Home Savings' assignment of error is sustained.

{¶58} Judgment reversed and remanded for a hearing on the damages Home Savings is entitled to as a result of Norfolk Southern's breach of contract.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, PRESIDING JUDGE

JAMES J. SWEENEY, J., and
KATHLEEN ANN KEOUGH, J., CONCUR